NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>Pacific Reporter</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>Appellant,<br><br>v.<br><br>KENNETH JOHN JOUPPI,<br><br>Appellee. | Court of Appeals No. A-13147<br>Trial Court No. 4FA-12-03228 CR<br><br>O P I N I O N<br><br>No. 2734 — September 23, 2022 |

Appeal from the District Court, Fourth Judicial District, Fairbanks, Patrick S. Hammers, Judge.

Appearances: Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellant. Robert John, Law Office of Robert John, Fairbanks, for the Appellee.

Before: Allard, Chief Judge, Wollenberg, Judge, and Mannheimer, Senior Judge.[*]

Judge ALLARD, writing for the Court.
Judge MANNHEIMER, concurring and dissenting.

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Kenneth John Jouppi and his air transport company, Ken Air, LLC, were convicted of unlawfully importing alcoholic beverages into a local option community.[1] (A "local option" community is a community that has exercised its option under AS 04.11.491 to restrict or prohibit the importation of alcohol.)

When a person or entity is convicted of unlawful importation of alcoholic beverages into a local option community, Alaska law requires the forfeiture of any aircraft used to facilitate the transportation of the alcoholic beverages into the local option community.[2]

At sentencing, Jouppi and Ken Air argued that this mandatory forfeiture provision did not apply to them because Jouppi was apprehended as he was preparing to take off — *i.e.*, before any alcoholic beverages were actually transported to the local option community. Jouppi also argued that, under the facts of his case, the mandated forfeiture would violate the state and federal constitutional prohibitions on excessive fines.

The district court initially ruled that the mandatory forfeiture provision of the statute did not apply to Jouppi because he was apprehended before the alcoholic beverages were transported to the local option community. The State appealed this ruling, and we reversed the district court's ruling because we interpreted the statute as requiring forfeiture of the airplane regardless of whether the transportation of the

---

[1] AS 04.11.499(a) ("[A] person . . . may not knowingly send, transport, or bring an alcoholic beverage into the municipality or established village, unless the alcoholic beverage is sacramental wine . . . .").

[2] AS 04.16.220(a)(3), (i)(1); *see State v. Jouppi*, 397 P.3d 1026, 1031-32 (Alaska App. 2017).

alcoholic beverages was completed or only attempted. We then remanded Jouppi's case to the district court for further proceedings.[3]

On remand, the district court found that Jouppi's airplane was worth approximately $95,000, and the court ruled that forfeiture of this airplane would constitute an unconstitutionally excessive fine because the monetary amount of the forfeiture was "grossly disproportional to the gravity of the offense."

The State now appeals this ruling. For the reasons explained in this opinion, we conclude that additional proceedings are required to determine whether the forfeiture of Jouppi's airplane constitutes an excessive fine — and, if so, whether a partial forfeiture should be ordered.

*Background facts and prior proceedings*

Jouppi and his wife were the two principals of Ken Air, LLC, an air transport business. Jouppi was the only pilot working for Ken Air, and he owned the airplane involved in this case — an airplane that he leased to Ken Air.

On April 3, 2012, Alaska state troopers observed Jouppi help a passenger, Helen Nicholia, load her cargo into the airplane as it sat on the tarmac at the Fairbanks Airport. Nicholia had booked passage to Beaver, a village that had totally prohibited the importation of alcoholic beverages. After Jouppi started the engine and prepared to take off, the troopers approached the plane and directed Jouppi to shut off the engine. The troopers then executed a previously issued search warrant for the airplane.

As the troopers looked through the plane's windows, they could see beer in a plastic grocery bag sitting unsecured in the plane. They testified that the beer was

---

[3] *Jouppi*, 397 P.3d at 1035-36.

in plain sight, obvious to any observer. The troopers ultimately found a total of nine gallons of beer in the boxes and bags that Jouppi had loaded into the airplane.

Both Jouppi and Ken Air were charged with unlawful transportation of alcoholic beverages into a local option community.[4] Because the amount of beer was less than twelve gallons, this charge was a class A misdemeanor.[5] For this offense, Jouppi faced a potential penalty of up to 1 year of imprisonment and a fine of up to $10,000.[6] Because Ken Air was a corporate entity, it faced a potential fine of up to $500,000.[7]

---

[4] AS 04.11.499(a). Under AS 04.11.499(a), a person is guilty if they "transport" or "bring" alcoholic beverages into a local option community. Under AS 04.11.499(c)(1), "'bring' means to carry or convey or to attempt or solicit to carry or convey." Likewise, under AS 04.11.499(c)(3), "'transport' means to ship by any method, and includes delivering or transferring or *attempting* or soliciting to deliver or transfer an alcoholic beverage" into a local option community.

[5] *See* AS 04.16.200(e)(1) (classifying the crime as "a class A misdemeanor if the quantity of alcoholic beverages is less than 10 and one-half liters of distilled spirits or 24 liters of wine, or either a half-keg of malt beverages or 12 gallons of malt beverages in individual containers"); *see also* AS 04.16.200(e)(2) (classifying the crime as "a class C felony if the quantity of alcoholic beverages is 10 and one-half liters or more of distilled spirits or 24 liters or more of wine, or either a half-keg of malt beverages or 12 gallons or more of malt beverages in individual containers"); AS 04.16.200(e)(3) (classifying the crime as a class C felony if the person has been previously convicted of the crime or of violating AS 04.11.010 "two or more times within 15 years of the present offense").

[6] *See* AS 12.55.135(a); former AS 12.55.035(b)(5) (2012). Class A misdemeanors still carry a maximum penalty of 1 year imprisonment, but the maximum fine has been increased to $25,000. *See* AS 12.35.035(b)(5).

[7] *See* former AS 12.55.035(c)(1)(B) (2012).

In addition to the imprisonment and the fines, Jouppi and Ken Air also faced mandatory forfeiture of the aircraft that was used to facilitate the transportation of the beer to the local option community.[8]

Following a jury trial, both Jouppi and Ken Air were convicted of violating AS 04.11.499(a). The district court sentenced Jouppi to 180 days of imprisonment with 177 days suspended (3 days to serve), and the court imposed a fine of $3,000 with $1,500 suspended ($1,500 to pay). The district court imposed a fine of $10,000 with $8,500 suspended (again, $1,500 to pay) against Ken Air.

As we have already explained, the district court initially ruled that the applicable statutes did not mandate forfeiture of the airplane involved in this offense, but we reversed this ruling on appeal. When Jouppi's case returned to the district court, the court addressed the other arguments against forfeiture by Jouppi and Ken Air. First, Ken Air argued that it had no ownership interest in the airplane because it only leased the airplane from Jouppi, who was the registered owner. The court held an evidentiary hearing, and ultimately found, by a preponderance of the evidence, that the airplane was owned solely by Jouppi. (This finding has not been appealed by the State, and is not at issue in this appeal.) The court also found that the airplane was worth $95,000.

Next, the district court addressed Jouppi's argument that forfeiture of the airplane would constitute an excessive fine in violation of the Eighth Amendment of the United States Constitution and Article I, Section 12 of the Alaska Constitution. Ultimately, the court ruled that the forfeiture would constitute an unconstitutionally

---

[8]  *See Jouppi*, 397 P.3d at 1033-35 (interpreting AS 04.16.220(a)(3) and (i)(1)); AS 04.16.220(i)(1) ("Upon conviction for a violation of AS 04.11.010 or 04.11.499(a), if an aircraft . . . is subject to forfeiture under (a) of this section the court *shall*, subject to remission to innocent parties under this section, . . . order the forfeiture of an aircraft to the state[.]" (emphasis added)).

excessive fine because it was "grossly disproportional" to the gravity of Jouppi's offense.[9]  The court stated that it reached this ruling because the value of the plane (approximately $95,000) was nine and a half times the maximum fine that could have been imposed on Jouppi.  The court also reasoned that Jouppi's offense was "not nearly as egregious as other conduct that could result in mandatory forfeiture of a plane under the applicable statutes."

Although the district court cited *United States v. Bajakajian* (one of the seminal United States Supreme Court cases on the application of the Excessive Fines Clause to forfeitures of property), the district court did not expressly apply a *Bajakajian* analysis when it ruled that the forfeiture of Jouppi's airplane was unconstitutionally excessive.[10]

The State now appeals the district court's ruling.

*The legal background that informs our analysis of this case*

The Eighth Amendment to the United States Constitution declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  Article I, Section 12 of the Alaska Constitution contains

---

[9]   *See United States v. Bajakajian*, 524 U.S. 321, 334-37 (1998).

[10]   *Id.*

identical language.[11]  The Eighth Amendment prohibition against excessive fines is applicable to the States under the Due Process Clause of the Fourteenth Amendment.[12]

Under the pertinent decisions of the United States Supreme Court — the cases in which the Supreme Court has construed the Excessive Fines Clause as it relates to forfeitures of property — any Eighth Amendment challenge to a forfeiture involves a two-step analysis.[13]  First, a court must determine whether the forfeiture is a "fine" for purposes of the Excessive Fines Clause.[14]  This step requires the court to evaluate whether the forfeiture constitutes a "punishment" or if, instead, it is "purely remedial" in nature (*e.g.*, designed to recoup the Government's losses and/or costs).[15]

Second, if the court determines that the forfeiture is not purely remedial, the court must then determine whether the forfeiture is unconstitutionally excessive by

---

[11]  *See* Alaska Const. art. I, § 12 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.  Criminal administration shall be based upon the following:  the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the principle of reformation.").

[12]  *Timbs v. Indiana*, 139 S. Ct. 682, 689-90 (2019).

[13]  *Bajakajian*, 524 U.S. at 327-28; *Alexander v. United States*, 509 U.S. 544, 558-59 (1993); *Austin v. United States*, 509 U.S. 602, 622 (1993).

[14]  *Bajakajian*, 524 U.S. at 321, 327-29.

[15]  *Austin*, 509 U.S. at 610, 621, 622 n.14 ("[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." (quoting *United States v. Halper*, 490 U.S. 435, 448 (1989), *abrogated in part by Hudson v. United States*, 522 U.S. 93 (1997))); *see also Alexander*, 509 U.S. at 558-59; *Bajakajian*, 524 U.S. at 329 ("'[R]emedial action' is one 'brought to obtain compensation or indemnity[.]'" (first alteration in original) (quoting *Remedial* action, Black's Law Dictionary (6th ed. 1990))).

comparing the forfeiture to the gravity of the offense.[16] *Bajakajian* holds that a punitive forfeiture violates the Excessive Fines Clause if "the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense."[17]

In determining whether a forfeiture is "grossly disproportional" to the offense, a court should be guided by the factors articulated in *Bajakajian*.[18] These factors include: (1) the nature and extent of the defendant's crime and its relation to other criminal activity, (2) whether the defendant falls within the class of persons at whom the statute was principally aimed, (3) the other penalties that might be imposed on the defendant under the applicable provisions of law, and (4) the nature and extent of the harm caused by the defendant's offense.[19]

Any findings of fact required by this analysis are to be made by the sentencing court using a preponderance of the evidence standard.[20] On appeal, we will accept the trial court's findings of fact unless they are shown to be clearly erroneous.[21] However, the ultimate question of whether a forfeiture is unconstitutionally excessive

---

[16] *Bajakajian*, 524 U.S. at 327-28; *Alexander*, 509 U.S. at 558-59.

[17] *Bajakajian*, 524 U.S. at 337.

[18] *Id.* at 337-39.

[19] *Id.*; *see also United States v. Beecroft*, 825 F.3d 991, 1000-01 (9th Cir. 2016); *United States v. Viloski*, 814 F.3d 104, 110 (2nd Cir. 2016).

[20] *See, e.g., United States v. Waked Hatum*, 969 F.3d 1156, 1162 (11th Cir. 2020); *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019); *United States v. Cheeseman*, 600 F.3d 270, 274 (3rd Cir. 2010).

[21] *Bajakajian*, 524 U.S. at 336 n.10.

is a question of law that we review *de novo*.[22]  In all cases, the burden is on the defendant to prove that the forfeiture in question constitutes an unconstitutionally excessive fine.[23]

In Jouppi's case, the State makes two different arguments as to why the forfeiture of Jouppi's airplane does not constitute an unconstitutionally excessive fine. First, the State argues that the Excessive Fines Clause does not apply to this case because Jouppi's airplane was an "instrumentality" of his offense.  Second, the State argues that, even assuming the Excessive Fines Clause applies, the district court erred when it concluded that forfeiture of Jouppi's airplane was "grossly disproportional" to the gravity of Jouppi's offense.  In the alternative, the State argues that, even assuming that forfeiture of the airplane is unconstitutionally excessive, the proper remedy is to order a partial forfeiture.

We address each of these arguments in turn.

*The State's argument that the Excessive Fines Clause does not apply to the forfeiture because Jouppi's airplane was an "instrumentality" of his offense*

The State argues that the Excessive Fines Clause does not apply to the forfeiture of Jouppi's airplane because the airplane was an "instrumentality" of Jouppi's offense.  This argument is without merit.

The forfeiture at issue in this case is an *in personam* forfeiture — that is, the forfeiture is being imposed as part of the sentence in a criminal case.  The United States Supreme Court has held that *in personam* forfeitures are considered punitive for purposes of the Excessive Fines Clause whenever, by statute, the forfeiture is an

---

[22]  *Id.*

[23]  *See, e.g.*, *Viloski*, 814 F.3d at 109; *United States v. Jose*, 499 F.3d 105, 108 (1st Cir. 2007); *Cheeseman*, 600 F.3d at 283.

additional penalty for a criminal conviction.[24]  As the Supreme Court explained in *Bajakajian*, the question of whether the property is an "instrumentality" is "irrelevant" to an *in personam* forfeiture:

> [When] the Government has sought to punish [a defendant] by proceeding against him criminally, *in personam*, rather than proceeding *in rem* against the ["guilty property" itself] . . . [i]t is . . . irrelevant whether the [defendant's property] is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination.[25]

Accordingly, we reject the State's argument that the Excessive Fines Clause does not apply to this case.


*The State's argument that the district court erred when it concluded that, under the facts of this case, the forfeiture of Jouppi's airplane was "grossly disproportional" to the gravity of his offense*

The seminal case in this area is *United States v. Bajakajian*.[26]  *Bajakajian* holds that a forfeiture is excessive under the Excessive Fines Clause only if it is "grossly disproportional to the gravity of a defendant's offense."[27]  *Bajakajian* further holds that,

---

[24]  *Bajakajian*, 524 U.S. at 328, 332 ("[*In personam*] forfeitures have historically been treated as punitive, being part of the punishment imposed for felonies and treason in the Middle Ages and at common law.").

[25]  *Id.* at 333-34.

[26]  *United States v. Bajakajian*, 524 U.S. 321 (1998).

[27]  *Id.* at 334.

as a general matter, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature."[28]

The defendant in *Bajakajian* transported $357,144 in cash outside the United States without reporting to customs that he was transporting more than $10,000 in currency, as federal law required.[29] Bajakajian was convicted of failing to report the cash, and under the pertinent federal statutes, he faced mandatory forfeiture of the entire $357,144.[30]

In a five-to-four decision, the United States Supreme Court held that forfeiture of the entire $357,144 constituted an unconstitutionally excessive fine.[31] In reaching this conclusion, the Court considered the following factors: "the essence of the [defendant's] crime," whether the defendant "fit into the class of persons for whom the statute was principally designed," the maximum sentence and fine that could have been imposed for the defendant's offense, and the extent and effect of the harm caused.[32]

Noting that Bajakajian's currency was wholly derived from legal activity and was being used to repay a lawful debt, the Supreme Court concluded that Bajakajian's offense was "solely a reporting offense" and that it was "unrelated to any other illegal activities."[33] The Court also concluded that Bajakajian did not fit into the class of persons for whom the statute was principally designed — namely, money

---

[28] *Id.* at 336.

[29] *Id.* at 324.

[30] *Id.*

[31] *Id.*

[32] *Id.* at 344, 337-39.

[33] *Id.* at 337-38.

launderers, drug traffickers, and tax evaders.[34]  The Court further concluded that the minimal penalties that Bajakajian faced under the sentencing guidelines — a maximum sentence of 6 months' imprisonment and a maximum fine of $5,000 — "confirm[ed] a minimal level of culpability."[35]

The Court also referred to the "minimal harm" caused by Bajakajian:

> Failure to report his currency affected only one party, the Government, and in a relatively minor way.  There was no fraud on the United States, and [Bajakajian] caused no loss to the public fisc.  Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country.[36]

The Supreme Court also noted that there was no inherent proportionality between the amount of harm caused by Bajakajian's offense and the amount of money being forfeited.  The Court declared that significantly more harm would be caused by "a hypothetical drug dealer who willfully fail[ed] to report taking $12,000 out of the country in order to purchase drugs."[37]

Based on all of these considerations, the Court held that forfeiture of the entire $357,144 was "grossly disproportional to the gravity of [Bajakajian's] offense" and was therefore unconstitutionally excessive.[38]

---

[34]  *Id.* at 338.

[35]  *Id.* at 338-39.

[36]  *Id.* at 339.

[37]  *Id.*

[38]  *Id.* at 339-40.

*Application of the <u>Bajakajian</u> factors to the present case*

Although *Bajakajian* does not itself refer to "factors," state and federal courts generally refer to the "*Bajakajian* factors" when describing the different factors that courts should consider when assessing whether a forfeiture constitutes an unconstitutionally excessive fine. These factors — distilled from the *Bajakajian* decision, and often summarized in slightly different ways by different courts — generally include the following: (1) the nature and extent of the defendant's crime and its relation to other criminal activity, (2) whether the defendant falls among the class of persons for whom the statute was principally designed, (3) the other penalties that might be imposed on the defendant under the applicable provisions of law, and (4) the nature and extent of the harm caused by the defendant's offense.[39]

In Jouppi's case, the district court addressed some of these factors in its decision.

For example, the district court specifically mentioned the other penalties that could be imposed on Jouppi under the pertinent sentencing statutes. The court noted that Jouppi was convicted of a class A misdemeanor, and thus he faced a maximum term of imprisonment of 1 year and a maximum fine of $10,000. The court then compared the value of Jouppi's airplane (which the court found to be worth approximately $95,000) to the maximum fine that Jouppi could receive ($10,000), and the court concluded that this almost ten-to-one ratio suggested that the forfeiture of the airplane might be an excessive fine.

The court also made some findings regarding the nature and extent of Jouppi's crime, although these findings were incomplete.

---

[39] *Id.*; *see also United States v. Beecroft*, 825 F.3d 991, 1000-01 (9th Cir. 2016); *United States v. Viloski*, 814 F.3d 104, 110 (2nd Cir. 2016).

At trial, the State presented evidence that Jouppi's cargo included nine gallons of beer that his passenger, Nicholia, intended to bring into Beaver (a local option community). The State also presented evidence that Jouppi personally loaded most, if not all, of this cargo into his airplane, and that at least one six-pack of this beer was in a see-through grocery bag and was clearly visible.[40]

In its order, the district court at one point considered the "two ways one could consider the gravity of Mr. Jouppi's conduct." The court noted, "One could say that Mr. Jouppi's crime was, in substance, attempting to bring [only] a six pack of beer to a local option community." But the district court also acknowledged that Jouppi's crime could be viewed as a more serious offense, given the fact that "the clearly visible [six-pack of] beer should have alerted Mr. Jouppi to the likelihood that there was additional alcohol elsewhere in his passenger's belongings, and that Mr. Jouppi's 'willful blindness' extend[ed] to all of the alcohol on board the plane."

The district court did not actually resolve which of these views was correct. Instead, the court analyzed the forfeiture issue by "assum[ing], without deciding, that [Jouppi's] culpability extends to all [nine gallons] of the beer."

The trial court also failed to address whether Jouppi's violation of the bootlegging statute was related to, or comprised part of, other illegal activities. In fact, the district court refused to hear evidence on this issue.

During the district court proceedings, the State asserted that this was not the first time that Jouppi had agreed to transport alcohol into a local option community. According to the State, Jouppi "made it clear" that he did not actively investigate whether his passengers were carrying alcohol; instead, Jouppi would wait a few times

---

[40] *State v. Jouppi*, 397 P.3d 1026, 1028 (Alaska App. 2017).

and then, if he became certain that a particular passenger was smuggling alcohol, he would make an effort not to transport that passenger anymore.[41]

The State argued that, by adopting this business model, Jouppi obtained an unfair advantage over the other flying services — because every other air charter company made it clear to their passengers that they and their luggage were subject to being searched for contraband, and that the company would report any violations to the authorities. That is, by purposely turning a blind eye to this illegal activity, Jouppi and Ken Air could charge their passengers hundreds of dollars more than their competitors. Thus, according to the State, Jouppi reaped substantial monetary benefits from his willful ignorance of the smuggling.

In an attempt to prove these allegations, the prosecutor attempted to call a village public safety officer from the village of Shungnak to testify at Jouppi's sentencing. According to the State's offer of proof, this officer would testify that Jouppi frequently transported passengers to Shungnak, and that the amount of alcohol in the village, as well as the number of alcohol-related crimes, had significantly decreased ever since the district court imposed bail conditions on Jouppi and Ken Air which totally prohibited Jouppi and his company from transporting alcoholic beverages. The prosecutor also sought to offer evidence that, even though other air services flew into Shungnak, it was unlikely that any alcoholic beverages came into Shungnak through these other air carriers — because, unlike Jouppi, these other carriers made a practice of searching their customers' luggage for alcoholic beverages.

---

[41] This assertion was partially corroborated by Jouppi's own testimony at sentencing where he testified that, when he first began providing air taxi services to local option communities, he did search his passengers' luggage, but he lost clients as a result and he therefore stopped doing the searches.

The district court refused to allow this testimony, in part because (according to the court) this testimony had no relevance to Jouppi's sentencing for the particular instance of alcohol smuggling in this case. But the proposed testimony was clearly relevant to at least one of the *Bajakajian* factors: whether Jouppi's offense was related to, or comprised part of, other illegal activities.[42] The State offered to prove that Jouppi's illegal conduct in this case was part of a larger pattern of illegal conduct — a pattern of conduct that was motivated, at least in part, by Jouppi's desire for financial gain. Under *Bajakajian*, this evidence was relevant to the analysis of whether the forfeiture of Jouppi's airplane was excessive under the Eighth Amendment. Thus, the district court should have given the State the opportunity to present this evidence — and the court should have made appropriate findings regarding whether Jouppi's offense in this case was an isolated occurrence or, instead, part of a larger pattern of illegal conduct.

The district court should also have made clearer findings regarding the extent of the harm caused by Jouppi's illegal conduct. In its order, the district court emphasized that Jouppi was convicted only of *attempting* to import beer into the local option community, and that the troopers stopped him before he was able to take off. According to the district court, this showed that the harm caused by Jouppi's offense was minimal, because "the beer never actually made it to Beaver." But the district court's conclusion was based on an incorrect legal analysis.

As the United States Supreme Court made clear in *Bajakajian*, the extent of harm caused by a defendant's illegal activities is evaluated based on the harm that would have been caused if the defendant had not been apprehended.[43] In *Bajakajian*, the only harm that would have occurred, if Bajakajian's crime had gone undetected, was that

---

[42] *Bajakajian*, 524 U.S. at 337-38.

[43] *Id.* at 339.

the government would not have learned that $357,144 in cash had left the country (because Bajakajian obtained this cash from lawful activities, and he intended to use the cash to pay a lawful debt).[44] In Jouppi's case, however, if Jouppi's crime had not been interrupted by the state troopers, the result would have been the unlawful importation of nine gallons of beer into a local option community.

In its decision, the district court noted that the smuggling of nine gallons of beer was only a misdemeanor,[45] and the court declared that Jouppi's offense was not a serious violation of the statute because this amount of beer "could have plausibly all been intended for [the] passenger's personal consumption, or her family's personal consumption." But the fact that Jouppi was only convicted of a misdemeanor, and the fact that the nine gallons of beer might have been intended only for the personal use of Jouppi's passenger and her family, does not necessarily mean that the forfeiture of Jouppi's airplane was grossly disproportional to the gravity of his offense.

Two central legal principles were acknowledged by the Supreme Court in *Bajakajian*. First, the legislature is the branch of government entrusted with evaluating how serious various kinds of criminal activity are, and what penalties are appropriate for

---

[44] *Id.* at 339, 351.

[45] *See* AS 04.16.200(e)(1) (classifying the crime as "a class A misdemeanor if the quantity of alcoholic beverages is less than 10 and one-half liters of distilled spirits or 24 liters of wine, or either a half-keg of malt beverages or 12 gallons of malt beverages in individual containers"); *see also* AS 04.16.200(e)(2) (classifying the crime as "a class C felony if the quantity of alcoholic beverages is 10 and one-half liters or more of distilled spirits or 24 liters or more of wine, or either a half-keg of malt beverages or 12 gallons or more of malt beverages in individual containers"); AS 04.16.200(e)(3) (classifying the crime as a class C felony if the person has been previously convicted of the crime or of violating AS 04.11.010 "two or more times within 15 years of the present offense").

any particular criminal offense.[46]  Second, courts must give substantial deference to the legislature's evaluation of this matter.[47]

Because of these two principles, *Bajakajian* requires a sentencing court to assess whether the defendant fits among "the class of persons for whom the statute was principally designed."[48]  If so, then the legislatively mandated penalties — including the mandatory forfeiture provision — presumably represent the legislature's assessment of the appropriate penalty for the defendant's crime.

In Jouppi's case, the district court should have assessed whether the forfeiture provisions of AS 04.16.220(a) are aimed at offenders like Jouppi.  The district court did not directly address this question in its order.

There is no question that the forfeiture of an airplane under AS 04.16.-220(a) can be harsh.  But it also appears, from the legislative history of this forfeiture provision, that the legislature intended this penalty to be harsh.

Our forfeiture statute was initially enacted in 1980 as part of a comprehensive statutory scheme that included the first "local option" statutes — *i.e.*, the statutes that gave communities the authority to limit or ban the sale of alcoholic beverages, or to totally prohibit the importation of these beverages into the community.[49]

---

[46]  *Bajakajian*, 524 U.S. at 336.

[47]  *Id.*

[48]  *Id.* at 338.

[49]  *See* SLA 1980, ch. 131, § 3; *Harrison v. State*, 687 P.2d 332, 335-36 (Alaska App. 1984).  The original local option statutes gave communities the authority to limit or ban the sale of alcoholic beverages, or to totally prohibit the importation of these beverages into the community.  *Id.*  In 1986, the Alaska legislature expanded the authority of local communities to control alcoholic beverages — this time, by enacting a statute that authorized municipalities and villages to completely ban the possession of alcoholic beverages.  *See*
(continued...)

The legislature enacted these local option statutes in response to a series of studies that highlighted the massive problems that alcoholism and alcohol-related crime posed for the State of Alaska and, particularly, rural Alaska.[50] These studies showed that one out of ten Alaskans was an alcoholic and that Alaska's alcoholism mortality rate (as of 1975) was over five times the national average.[51] The studies also indicated that almost four-fifths of the violent crimes and over half of the property crimes in Alaska were committed by offenders who were under the influence of alcohol and that the total cost of alcohol-related crime amounted to almost one-third of the State of Alaska's total criminal justice system expenditures.[52]

Initially, the legislature authorized the forfeiture of aircraft, watercraft, and motor vehicles used to illegally transport alcohol into local option communities, but these forfeitures were subject to the sentencing court's discretion.[53] Then, in 2004, the Alaska legislature altered the law by enacting the mandatory forfeiture provision at issue in

---

(...continued)
SLA 1986, ch. 80, § 2. This expansion of the local option statutes was accompanied by legislative findings regarding the dangers to public health and safety arising from alcohol abuse in small and isolated parts of the state. *See* SLA 1986, ch. 80, § 1.

[50] *See Harrison*, 687 P.2d at 335-36.

[51] *Id.* at 335 (citing Governor's Commission on the Administration of Justice, *Standards and Goals for Criminal Justice* 41 (1976) and Analysis of Alcohol Problems Project, *Working Papers: Descriptive Analysis of the Impact of Alcoholism and Alcohol Abuse in Alaska, 1975*, vol. V, at 14 (1977)).

[52] *Id.* (citing Alaska Judicial Council, *Alaska Felony Sentences: 1976-1979*, at 45-48, 65-67 (1980)); *Abraham v. State*, 585 P.2d 526, 532-33 n.19 (Alaska 1978) (citing National Council on Alcoholism, *Executive Summary of Alcohol Misuse and Alcoholism in Alaska*).

[53] Former AS 04.16.220(a)(3) (1980).

Jouppi's case.[54]  The legislature's stated purpose in enacting this mandatory forfeiture provision was to "strengthen[] the forfeiture law for bootlegging offenses."[55]

Significantly, the current mandatory forfeiture provision distinguishes between forfeitures of aircraft (which are governed by stricter rules) and forfeitures of vehicles and watercraft (which are governed by more lenient rules).

When a vehicle or watercraft is used to illegally transport alcohol to a local option community, that vehicle or watercraft is subject to mandatory forfeiture only if: (1) the bootlegger has a conviction for a violent felony or is on felony probation or parole, (2) the bootlegger has a prior conviction for bootlegging, or (3) the bootlegger has been convicted under AS 04.11.010 and the amount of alcohol involved is twice the amount presumed to be possessed for sale, as set out in AS 04.11.010(c).[56]  Even then, the sentencing court is not required to order the forfeiture if the vehicle or watercraft is the only means of transportation for a family living in a village and if the other family members were innocent or could not have prevented the bootlegging.[57]

In contrast, when an aircraft is used to facilitate the illegal transportation of alcohol into a local option community under AS 04.11.499(a) or AS 04.11.010, a sentencing court is required to forfeit the aircraft, regardless of whether the offense is a

---

[54]  Former AS 04.16.220 (2004).

[55]  Letter from Assistant Attorney General David Marquez to House Finance Co-Chair Hon. John Harris on Highlights of Governor's 2004 Crime Bill (CSSB 170) (April 30, 2004); *see* Sectional Summary for Senate Bill 170 (April 5, 2004) (noting that Senate Bill 170 would "improve the law for forfeiture of property used in bootlegging" and would "strengthen forfeiture law for vehicles, watercraft, and aircraft used to bootleg alcohol").

[56]  AS 04.16.220(i)(2); *see also* Sectional Summary for Senate Bill 170 (April 5, 2004) (listing forfeiture exceptions under AS 04.16.220(i) but noting that "[t]here is no exception to forfeiture if the property is an aircraft").

[57]  AS 04.16.220(j); *see also* Sectional Summary for Senate Bill 170 (April 5, 2004).

misdemeanor or a felony (that is, regardless of the amount of alcohol involved) and even when the offense is the defendant's first conviction.[58] The only limitation is that the forfeiture is subject to remission if the owner of the aircraft is a non-negligent innocent party.[59]

We have reviewed the pertinent legislative history of these forfeiture provisions. This legislative history does not contain an explicit explanation of why the legislature chose to create different rules for the forfeitures of aircraft versus the forfeitures of vehicles and watercraft. But it is clear that the legislature intended to treat aircraft forfeitures differently — by creating stricter forfeiture rules for cases where a bootlegger uses an aircraft to facilitate their offense.

Under *Bajakajian*, and under the legal principle that the legislature normally decides what penalties are appropriate for a particular criminal offense, the district court should have considered this legislative history when the court assessed whether the forfeiture of Jouppi's airplane was grossly disproportional to the gravity of his offense.

Ultimately, in our view, the question of whether the forfeiture of Jouppi's airplane is "grossly disproportional to the gravity of the offense" turns on factual findings that the district court did not make and on legal analysis that the court did not engage in. Accordingly, we remand this case to the district court for further proceedings and a fuller application of the *Bajakajian* factors.

On remand, the trial court shall also consider an additional factor that Jouppi has raised on appeal — whether forfeiture of the airplane would deprive Jouppi of his ability to earn a livelihood.

---

[58]  *See* AS 04.16.220(i).

[59]  AS 04.16.220(i); *see also* AS 04.16.220(e)-(f).

In *Bajakajian*, the defendant did not argue that forfeiture of the unreported cash would deprive him of his livelihood, and therefore the Supreme Court did not address this claim.[60]   But, as *Bajakajian* otherwise acknowledges, the Excessive Fines Clause grew out of the English constitutional tradition, including the Magna Carta, which required that a fine "should not deprive a wrongdoer of his livelihood."[61]   In recognition of this fact, some courts have treated "deprivation of livelihood" as an additional factor to be considered when assessing whether a forfeiture violates the Excessive Fines Clause.[62]

In considering whether a forfeiture would deprive the defendant of their livelihood, the focus is on the defendant's "future ability to earn a living."[63]   Deprivation of one's chosen occupation is not enough.[64]   Courts consider factors such as the

---

[60]   *United States v. Bajakajian*, 524 U.S. 321, 340 n.15 (1998).

[61]   *Id.* at 335; *see also United States v. Viloski*, 814 F.3d 104, 111 (2nd Cir. 2016).

[62]   *See Viloski*, 814 F.3d at 111-12 (holding that deprivation of livelihood is another factor to be considered in the *Bajakajian* analysis, not a separate inquiry); *accord United States v. Johnson*, 956 F.3d 510, 519-520 (8th Cir. 2020); *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 124 P.3d 408, 421 (Cal. 2005).   However, some courts have treated deprivation of livelihood as its own separate inquiry.   *See United States v. Levesque*, 546 F.3d 78, 84-85 (1st Cir. 2008) (holding that deprivation of livelihood is a question to be considered separate from the *Bajakajian* test).

[63]   *Viloski*, 814 F.3d at 107; *Levesque*, 546 F.3d at 85 ("A defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, nor is it even the correct inquiry.").

[64]   *See, e.g.*, *United States v. Dicter*, 198 F.3d 1284, 1292 n.11 (11th Cir. 1999) (rejecting a doctor's claim that forfeiture of his medical license would deprive him of his livelihood, observing that "most people earn a living without a medical license"); *United States v. West*, 431 F. Supp. 3d 1054, 1067 (N.D. Iowa 2020) (finding that the forfeiture of defendant's nursing license would not deprive defendant of his livelihood, as the "defendant could [do]

(continued...)

defendant's ability to provide for their family, employment history, skills, net worth, and personal assets when assessing whether the defendant has shown that the amount of the forfeiture would deprive them of their ability to earn a living.[65]  Because the focus is on a defendant's future ability to earn a living, courts have found a "deprivation of livelihood" only in circumstances where the defendant has almost no job prospects or could not possibly provide for their family because of the amount of the monetary loss.[66]

Because we are remanding Jouppi's case to the district court on other grounds, we conclude that Jouppi should be given an opportunity to put forward evidence showing that the forfeiture of his airplane will effectively deprive him of any future ability to earn a living.

### The State's argument regarding partial forfeiture

On remand, the district court shall re-evaluate the forfeiture of Jouppi's airplane under a *Bajakajian* analysis, and shall make any factual findings necessary to that analysis.  The district court shall also address any deprivation of livelihood argument that Jouppi may make.

---

[64]  (...continued)
work that would not require nursing licenses").

[65]  *See, e.g.*, *United States v. Muzaffar*, 714 F. App'x 52, 58 (2nd Cir. 2017) (remanding case to assess whether forfeiture would deprive defendant, who had a ninth-grade education and no meaningful employment history, of livelihood); *United States v. King*, 231 F. Supp. 3d 872, 1007-14 (W.D. Okla. 2017) (limiting forfeiture amounts for several defendants because of considerations like low net worth, work-related disability, and need to support minor children); *see also Levesque*, 546 F.3d at 79-80 (remanding case to determine if defendant, who was a single mother, high school dropout, and had been largely unemployed since 2005, would be deprived of livelihood given three-million-dollar forfeiture amount).

[66]  *See Muzaffar*, 714 F. App'x at 58; *King*, 231 F. Supp. 3d at 1007-14.

If the district court ultimately determines that the forfeiture of Jouppi's airplane is "grossly disproportional" to the gravity of the offense (and hence unconstitutionally excessive), the court shall then address the State's argument that a partial forfeiture should be ordered. The United States Supreme Court did not address the question of partial forfeiture in *Bajakajian* because that question was not directly before it.[67] But courts in other jurisdictions, after finding that a particular forfeiture was unconstitutionally excessive, have sometimes reduced the forfeiture amounts until those amounts were no longer "grossly" disproportional to the offense.[68] In circumstances where the property to be forfeited was not readily divisible (*e.g.*, land, homes, and vehicles), courts have ordered the forfeiture of a partial interest in the property.[69]

---

[67] In *Bajakajian*, the government sought to forfeit $357,144, but at sentencing, the district court ordered $15,000 in forfeiture, concluding that forfeiture of more than that amount would be disproportional to Bajakajian's culpability. *United States v. Bajakajian*, 524 U.S. 321, 326 (1998). The question before the appellate courts was whether the full forfeiture amount would violate the Excessive Fines Clause. *Id.* at 324. The Ninth Circuit and U.S. Supreme Court concluded that it would be unconstitutional and affirmed the district court's order. *Id.* at 326.

[68] *See, e.g.*, *United States v. Castello*, 611 F.3d 116, 120 (2nd Cir. 2010) ("The proper amount of forfeiture . . . is the total forfeitable amount required by the statute, discounted by whatever amount is necessary to render the total amount not 'grossly disproportional' to the offense of conviction."); *United States v. Sarbello*, 985 F.2d 716, 718 (3rd Cir. 1993) ("We hold that the [sentencing] court may reduce [an otherwise mandatory criminal forfeiture] in order to conform to the eighth amendment."); *U.S. v. Toyfoya*, 1994 WL 477173, at *5 (N.D. Cal. 1994) (unpublished) ("[If] the Court . . . finds the punishment to be in violation of the Eighth Amendment, the Court can limit the total punishment imposed in a variety of ways to bring it within constitutional limits."). The federal rules for civil forfeiture proceedings also provide, "If the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment of the Constitution." 18 U.S.C. § 983(g)(4).

[69] *See, e.g.*, *United States v. Ferro*, 681 F.3d 1105, 1110, 1114-17 (9th Cir. 2012)
(continued...)

Accordingly, if the district court concludes that the mandatory forfeiture of Jouppi's airplane is unconstitutionally excessive, the court should then address the State's argument for partial forfeiture.

*Our disagreement with the dissent*

Judge Mannheimer's dissent agrees that the district court failed to properly apply the *Bajakajian* factors. But the dissent disagrees that a remand is necessary because it concludes that forfeiture of Jouppi's airplane is "clearly proper" as a matter of law.

The dissent comes to this conclusion based, in part, on its view that because the legislature's decision to require mandatory forfeiture of aircraft in misdemeanor importation cases was "not plainly unreasonable," the forfeiture of Jouppi's airplane cannot be "grossly disproportional" for Eighth Amendment purposes. But the question we face in this case is not whether the statute mandating forfeiture is unconstitutional; rather the question is whether the statute *as applied* to Jouppi's unique circumstances and

---

(...continued)

(remanding case to the district court to consider widow's personal culpability and whether some portion greater than 10% of her husband's gun collection should be returned to her); *Von Hofe v. United States*, 492 F.3d 175, 191 (2nd Cir. 2007) (finding that forfeiture of husband's one-half interest in family residence was not excessive, but that forfeiture of the wife's interest was, and remanding case to determine appropriate partition, given that the forfeiture of husband's interest could create tenancy in common between wife and government); *United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham*, 960 F.2d 200, 207 (1st Cir. 1992) (affirming forfeiture of one-third interest in real property). Courts have indicated that the government is not required to accept a money judgment in lieu of the partial forfeiture of real property. *See Von Hofe v. United States*, 492 F.3d 175, 191 (2nd Cir. 2007) (noting that the forfeiture of real property provides a "powerful deterrent" against illegal activity (citing *Austin v. United States*, 509 U.S. 602 (1993))).

facts mandates a grossly disproportional forfeiture.[70]   Thus, while we agree with the dissent that substantial deference must be given to the legislature's decision (and that this deference is part of the *Bajakajian* analysis), we disagree that the excessiveness of the forfeiture in Jouppi's case can therefore be decided as a matter of law, without consideration of the particular facts of Jouppi's case and his specific level of culpability.

The dissent also reasons that there is no need for the trial court to consider the *Bajakajian* factors in this *in personam* forfeiture case because, under its analysis of the case law, the Excessive Fines Clause would not apply to an *in rem* forfeiture of Jouppi's airplane and the only difference between an *in personam* forfeiture and an *in rem* forfeiture of the airplane is that Jouppi has actually been convicted of the illegal activity.   We disagree with the dissent's conclusion that the Excessive Fines Clause would not apply to an *in rem* forfeiture of Jouppi's airplane.

The dissent bases this conclusion on certain dicta in *Bajakajian* and the dissent's view that an *in rem* forfeiture of Jouppi's airplane would function the same as traditional *in rem* smuggling and customs revenue forfeitures that occurred in the eighteenth and nineteenth centuries.   In *Bajakajian*, the United States Supreme Court noted that "[t]raditional *in rem* forfeitures" were historically viewed as "nonpunitive" and therefore "outside the domain of the Excessive Fines Clause."[71]   But recent historical

---

[70]   *See Solem v. Helm*, 463 U.S. 277, 290 & n.16 (1983) (explaining that "[r]eviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining" criminal sentences, but that "no penalty is *per se* constitutional" as the court must "decide[] . . . whether the sentence under review is within constitutional limits").

[71]   *Bajakajian*, 524 U.S. at 331.

scholarship has cast doubt on the *Bajakajian* Court's statement that "traditional" *in rem* forfeitures were not subject to an excessiveness inquiry.[72]

Moreover, even assuming that this was the case historically, it does not necessarily follow that it remains the case today. In footnote six of the *Bajakajian* opinion, the Supreme Court distinguished between "traditional" *in rem* forfeitures related to customs and revenue statutes (which were purportedly nonpunitive in nature and therefore "outside the domain of the Excessive Fines Clause") and the more "modern" *in rem* forfeitures related to drug interdiction (which are recognized as punishment and

---

[72] For instance, Georgetown Law Professor Kevin Arlyck's work focusing on the constraints that the First Congress "imposed on early forfeiture calls into question key historical propositions underlying [Supreme] Court decisions insulating civil forfeiture from constitutional challenge," including that *in rem* forfeitures were traditionally not understood to be punishment. Kevin Arlyck, *The Founders' Forfeiture*, 119 Colum. L. Rev. 1449, 1450-53, 1482-85 (2019) (explaining that partially because of Treasury Secretary Alexander Hamilton's lobbying to mitigate "heavy and ruinous forfeitures," Congress passed the 1790 Remission Act giving the Treasury Department broad discretion to grant relief from forfeiture, which it did in approximately ninety percent of cases (citations omitted)); *see also* Beth A. Colgan, *The Burdens of the Excessive Fines Clause*, 63 Wm. & Mary L. Rev. 407, 464-66 (2021) (describing underlying history and arguing that the 1790 Remission Act's remittance procedures "were understood to be guided by the principles [against excessive fines] long-before secured by the Magna Carta"); Nicholas Bagley & Julian Davis Mortenson, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 345-47 (2021) (discussing how the First Congress delegated broad authority to the executive branch to forfeit private property but also gave the Treasury remission power); Sophia Z. Lee, *Our Administered Constitution: Administrative Constitutionalism from the Founding to the Present*, 167 U. Pa. L. Rev. 1699, 1717 & n.65 (2019) (discussing how the Treasury Secretary's "leniency [was] grounded in the Eighth Amendment").

subject to the Excessive Fines Clause).[73] The Court noted that one of the "hallmarks" of traditional *in rem* forfeitures was the lack of an innocent owner defense.[74]

Here, we are dealing with a modern statute that was originally enacted in 1980 and whose mandatory forfeiture provisions did not come into existence until 2004.[75] The statute includes an "innocent owner" provision, which indicates that the mandatory forfeiture is not entirely remedial in nature.[76]

---

[73] Footnote 6 of *Bajakajian* states:

> It does not follow, of course, that all modern civil *in rem* forfeitures are nonpunitive and thus beyond the coverage of the Excessive Fines Clause. Because some recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture, we have held that a modern statutory forfeiture is a "fine" for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled *in rem* or *in personam*. *See Austin v. United States*, [509 U.S. 602,] 621-622 [(1993)] (although labeled *in rem*, civil forfeiture of real property used "to facilitate" the commission of drug crimes was punitive in part and thus subject to review under the Excessive Fines Clause).

*Bajakajian*, 524 U.S. at 331 n.6.

[74] *Id.* at 331-32 ("The forfeiture in this case does not bear any of the hallmarks of traditional civil *in rem* forfeitures. The Government has not proceeded against the currency itself, but has instead sought and obtained a criminal conviction of respondent personally. The forfeiture serves no remedial purpose, is designed to punish the offender, and cannot be imposed upon innocent owners.").

[75] Former AS 04.16.220 (2004); SLA 1980, ch. 131, § 3; *see Harrison v. State*, 687 P.2d 332, 335-36 (Alaska App. 1984).

[76] *See* AS 04.16.220(e) (providing for an innocent owner defense in both *in personam* and *in rem* forfeitures); AS 04.16.220(f) (providing a defense for a "person other than the

(continued...)

The distinction between "purely remedial" forfeitures and forfeitures that are punitive, at least in part, was addressed in the pre-*Bajakajian* case, *Austin v. United States*.[77] The dissent treats the dicta in *Bajakajian* as effectively overruling *Austin*. But we disagree that *Austin* is no longer good law.

In *Austin*, the Supreme Court rejected the view that historical *in rem* forfeitures have always been remedial in nature, and the Court held that *in rem* forfeitures constituted a "fine" subject to the Excessive Fines Clause if the forfeiture had any punitive aspects.[78] The Court also rejected the government's argument that forfeiture of the "instrumentality" of a crime "serves solely a remedial purpose."[79] As the Court explained,

> The Government argues that [the forfeitures] are not punitive but, rather, should be considered remedial [because] they remove the "instruments" of the drug trade "thereby protecting the community from the threat of continued drug dealing." . . .

---

[76] (...continued) owner holding, or the assignee of, a lien, mortgage, conditional sales contract on, or the right to possession to property subject to [*in personam* or *in rem*] forfeiture").

[77] *Austin v. United States*, 509 U.S. 602 (1993).

[78] *Id.* at 609-10; *see also Bajakajian*, 524 U.S. at 329 n.4 ("We do not suggest that merely because the forfeiture of respondent's currency in this case would not serve a remedial purpose, other forfeitures may be classified as nonpunitive (and thus not 'fines') if they serve some remedial purpose as well as being punishment for an offense. Even if the Government were correct in claiming that the forfeiture of respondent's currency is remedial in some way, the forfeiture would still be punitive in part. (The Government concedes as much.) This is sufficient to bring the forfeiture within the purview of the Excessive Fines Clause." (citing *Austin*, 509 U.S. at 621-22)).

[79] *Austin*, 509 U.S. at 622.

. . . Concededly, we have recognized that the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society. The Court, however, previously has rejected government's attempt to extend that reasoning to conveyances used to transport illegal liquor. [In *One 1958 Plymouth Sedan v. Pennsylvania*,] it noted: "There is nothing even remotely criminal in possessing an automobile." The same, without question, is true of the properties involved here [*i.e.*, Austin's mobile home and his auto body shop], and the Government's attempt to characterize these properties as "instruments" of the drug trade must meet the same fate as Pennsylvania's effort to characterize the 1958 Plymouth sedan as "contraband."[80]

Since *Austin*, the vast majority of state and federal courts have followed this reasoning and have subjected *in rem* forfeitures of property that was used to facilitate a crime (like an automobile or a vessel) to the Excessive Fines Clause proportionality test.[81]

---

[80]   *Id.* at 620-21 (first citing *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 364 (1984); then quoting *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699 (1965)).

[81]   *See State v. Timbs*, 134 N.E.3d 12, 26 (Ind. 2019) (noting that the vast majority of federal and state courts have almost uniformly held that the excessiveness of *in rem* forfeitures of instrumentalities (as opposed to contraband or illegal proceeds) does not turn solely on whether the property was used in a crime but instead involves an Excessive Fines Clause proportionality test); *see also United States v. Ferro*, 681 F.3d 1105, 1115 (9th Cir. 2012); *Von Hofe v. United States*, 492 F.3d 175, 184 (2d Cir. 2007); *United States v. Dodge Caravan Grand SE/Sport Van*, 387 F.3d 758, 762-63 (8th Cir. 2004); *United States v. 45 Claremont St.*, 395 F.3d 1, 6 (1st Cir. 2004) (per curiam); *United States v. Wagoner Cnty. Real Est.*, 278 F.3d 1091, 1100 n.7, 1101 n.8 (10th Cir. 2002); *United States v. 817 N.E. 29th Dr.*, 175 F.3d 1304, 1309-10 (11th Cir. 1999); *Yskamp v. DEA*, 163 F.3d 767, 773 (3d Cir. 1998); *United States v. 415 E. Mitchell Ave.*, 149 F.3d 472, 477 (6th Cir. 1998);

(continued...)

Given this case law, we disagree with the dissent's conclusion that the Excessive Fines Clause would not apply to an *in rem* forfeiture of Jouppi's airplane. Under *Austin*, only purely remedial *in rem* forfeitures stand outside the domain of the Excessive Fines Clause, and purely remedial *in rem* forfeitures tend to involve contraband or the illegal proceeds of a criminal enterprise.[82] Such forfeitures "simply part[] the owner from the fruits of the criminal activity."[83] Here, the airplane is not strictly contraband or illegal proceeds of a criminal enterprise.[84] Instead, it is property

---

[81] (...continued)
*Commonwealth v. 1997 Chevrolet & Contents Seized from Young*, 160 A.3d 153, 185-86 (Pa. 2017); *Utah v. 633 East 640 North*, 994 P.2d 1254, 1257 (Utah 2000). *But see United States v. Chandler*, 36 F.3d 358, 365 (4th Cir. 1994) (applying a multi-factor "instrumentality" test to determine if property is subject to proportionality review); *Medlock v. One 1985 Jeep Cherokee*, 470 S.E.2d 373, 377 (S.C. 1996) (adopting Fourth Circuit test). We note, however, that the Fourth Circuit's "instrumentality" test still directs courts to consider issues such as "the role and culpability of the owner." *Chandler*, 36 F.3d at 365.

[82] *See United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 194 (2d Cir. 2013) (holding that illegal drug proceeds are not subject to the Eighth Amendment's restrictions on punishment as they are nonpunitive); *United States v. Davis*, 648 F.3d 84, 96-97 (2d Cir. 2011) (finding *in rem* forfeiture of stolen Pissarro monotype remedial because it was seized pursuant to a customs statute, it was unconnected to criminal prosecution, and culpability was irrelevant to forfeiture); *United States v. 22 Santa Barbara Dr.*, 264 F.3d 860, 874-75 (9th Cir. 2001) (concluding that *in rem* forfeiture of real property purchased with illegal drug proceeds was nonpunitive); *United States v. An Antique Platter of Gold*, 184 F.3d 131, 140 (2d Cir. 1999) (holding that the forfeiture of a Sicilian antique imported in violation of customs laws did not constitute a fine, as it was "classic contraband").

[83] *22 Santa Barbara Dr.*, 264 F.3d at 874.

[84] We note that the dissent cites to a number post-*Bajakajian* cases for the proposition that courts have closely followed the dicta in *Bajakajian* that the dissent views as effectively overruling *Austin*. However, the majority of these cases merely quote this dicta but add nothing to its analysis. While a few of the cases cited by the dissent hold that the forfeiture

(continued...)

used to facilitate the crime whose value is not directly linked to the reparative costs of the crime.[85]  As such, its forfeiture likely would be subject to the constitutional constraints of the Excessive Fines Clause, even if the forfeiture were *in rem*.

---

[84]  (...continued)
at issue constitutes traditional *in rem* forfeiture, they are readily distinguishable from the present case, as they resemble classic contraband or can be applied against innocent owners. *See Davis*, 648 F.3d at 96-97 (civil forfeiture of stolen artwork with no innocent owner defense); *An Antique Platter of Gold*, 184 F.3d at 139-40 (civil forfeiture of Sicilian antique gold platter presumed to belong to Italian government with no innocent owner defense); *United States v. 2011 Jeep Grand Cherokee*, 2013 WL 12106221 (W.D. Tex. 2013) (unpublished) (civil forfeiture of unlicensed armored jeep transported across U.S.-Mexico border in a commercial trailer with no innocent owner defense); *United States v. Any & All Radio, Station Transmission Equip.*, 2004 WL 2848532, at *3 (S.D.N.Y. Dec. 9, 2004) (unpublished) (civil forfeiture of radio communications devices with no innocent owner defense); *see also* 18 U.S.C. § 983(d), (i) (providing for an innocent owner defense in all federal *in rem* forfeiture proceedings except forfeitures pursuant to "(A) the Tariff Act of 1930 or any other provision of law codified in title 19 ['Customs Duties']; (B) the Internal Revenue Code of 1986; (C) the Federal Food, Drug, and Cosmetic Act . . . ; (D) the Trading with the Enemy Act . . . , the International Emergency Economic Powers Act . . . , or the North Korea Sanctions Enforcement Act of 2016; or (E) section 1 of title VI of the Act of June 15, 1917 ['Illegal exportation of war materials']"); 47 U.S.C. § 510(c)(1) (providing that forfeiture of radio communications devices are governed by customs forfeiture laws).

[85]  *Austin*, 509 U.S. at 619-22, 622 n.14 (holding that *in rem* forfeiture of mobile home and auto shop used to commit federal drug offense was partially punitive because it tied the forfeiture to a specific offense, included an innocent owner provision, and was not linked to the value of the crime); *see also Timbs*, 134 N.E.3d at 23-24 (holding that *in rem* forfeiture of Land Rover pursuant to use-based forfeiture statute was a fine because it tied "each forfeiture to the commission of a drug offense," included an innocent owner provision, and the value of the forfeiture was "neither a fixed sum nor linked to the harm caused by the underlying crime").

*Conclusion*

For the reasons explained in this opinion, we VACATE the judgment of the district court, and we REMAND this case to the district court for further proceedings consistent with this opinion.

Judge MANNHEIMER, concurring in part and dissenting in part.

Kenneth John Jouppi stands convicted of bootlegging — *i.e.*, attempting to smuggle alcoholic beverages into a community that had exercised its option under AS 04.11.491 to prohibit the importation of alcohol. Because Jouppi used his airplane to facilitate this act of smuggling, Alaska law requires the forfeiture of his airplane. See AS 04.16.220(a)(3)(C), as interpreted by this Court in Jouppi's previous appeal: *Jouppi v. State*, 397 P.3d 1026, 1035 (Alaska App. 2017).

The question presented in Jouppi's current appeal is whether, given the value of Jouppi's airplane (approximately $95,000), the forfeiture of this airplane constitutes an "excessive fine" and is therefore prohibited, or at least limited, by the Eighth Amendment to the United States Constitution.

A little over twenty years ago, in *United States v. Bajakajian*,[1] the Supreme Court held that a fine is "excessive" for purposes of the Eighth Amendment if the fine is "grossly disproportional" to the gravity of the offense.[2] (The Supreme Court declared that this is the same "gross disproportionality" test that the Court applies when a criminal sentence is challenged under the cruel and unusual punishment clause.[3])

In Jouppi's case, the district court ruled that the forfeiture of Jouppi's airplane was grossly disproportional to the gravity of his bootlegging offense, and the court therefore refused to impose the statutorily required forfeiture. (The court apparently failed to consider whether the Eighth Amendment would allow a partial forfeiture of the airplane.)

---

[1]   524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

[2]   *Bajakajian*, 524 U.S. at 334–37, 118 S.Ct. at 2036–38.

[3]   *Id.*, 524 U.S. at 336, 118 S.Ct. at 2037.

As explained in this Court's lead opinion, the district court failed to adequately consider, or to correctly apply, various aspects of the analysis set forth by the Supreme Court in *Bajakajian*. For this reason, my colleagues have concluded that we should remand Jouppi's case to the district court for reconsideration of whether the forfeiture of Jouppi's airplane would be "excessive" for purposes of the Eighth Amendment as interpreted in *Bajakajian*.

I agree with my colleagues that the district court failed to properly apply the *Bajakajian* factors to Jouppi's case. However, I dissent from this Court's decision to remand Jouppi's case to the district court — because I conclude that the forfeiture of Jouppi's airplane is clearly proper under the *Bajakajian* analysis.

I reach this conclusion for two reasons.

First, *Bajakajian* re-affirms the constitutional principle that the legislature is the branch of government primarily entrusted with deciding what punishments are appropriate for particular criminal offenses, and that courts should normally defer to the legislature's assessment.

Here, the Alaska legislature was confronted with a social problem of major proportions: alcoholism and alcohol-related crime were rampant in rural Alaska, and rural communities often lacked adequate police and health-care resources to deal with these problems. In response, the legislature authorized these communities to restrict and even prohibit the sale and possession of alcoholic beverages. And to punish and deter the smuggling of alcoholic beverages into these communities, our legislature enacted laws that call for the mandatory forfeiture of any airplane used to facilitate this smuggling.

As *Bajakajian* confirms, the Eighth Amendment was not intended to give courts a wide-ranging authority to second-guess the legislature's decisions regarding the appropriate penalties for particular crimes. Rather, under *Bajakajian*, when the

– 35 –

legislature has a legitimate reason for imposing a severe fine or forfeiture as a penalty for a crime, courts should defer to the legislature's assessment of the appropriate penalty in all but the most extreme cases.

The *in personam* forfeiture provision at issue in Jouppi's case — the mandatory forfeiture of airplanes that are used to smuggle alcoholic beverages into dry communities — is a reasonable component of the Alaska legislature's response to the crisis posed by alcohol abuse and alcohol-related crime in rural Alaska. As I discuss in this dissent, the *in personam* forfeiture of ships and airplanes used to commit or facilitate smuggling or poaching has been a fixture of Alaska law for over 150 years (long before statehood). Indeed, the Alaska legislature currently uses these same types of *in personam* forfeitures to enforce many of Alaska's other smuggling and poaching laws.

I thus conclude that, absent extraordinary circumstances, the forfeiture of airplanes under AS 04.16.220(a)(3)(C) — *i.e.*, the forfeiture of the airplanes used to facilitate the smuggling of alcoholic beverages into dry communities — does not violate the Eighth Amendment.

My second reason for concluding that the forfeiture of Jouppi's airplane is not "excessive" (for purposes of the Eighth Amendment) is based on another aspect of the *Bajakajian* decision: *Bajakajian* declares that the Eighth Amendment's excessive fines clause was not intended to prohibit or limit the government's traditional use of *in rem* forfeitures to confiscate vessels (and other conveyances) used to commit or facilitate acts of smuggling. Such forfeitures have been a fixture of American law for close to three centuries (since colonial times). And according to *Bajakajian*, these *in rem* forfeitures are not governed by the Eighth Amendment.

There is only one material distinction that can be drawn between the forfeiture in Jouppi's criminal case and the "traditional" forfeiture of Jouppi's airplane that could be imposed in an *in rem* civil proceeding against the airplane itself: In

Jouppi's case, the State not only proved that Jouppi's plane was used to facilitate an act of smuggling — a fact that would be sufficient to support an *in rem* forfeiture of the plane under AS 04.16.220(d)(2), regardless of who owned the plane, and regardless of whether Jouppi was personally involved in the act of smuggling — but the State also proved that Jouppi was himself criminally responsible for this act of smuggling.

This additional aspect of the government's proof — *i.e.*, that Jouppi was personally guilty of the crime of smuggling — does not suggest that the forfeiture of Jouppi's airplane might be "grossly disproportional" to the gravity of his conduct. Rather, it suggests just the opposite.

If, consistent with the Eighth Amendment, Jouppi's airplane could lawfully be forfeited in an *in rem* proceeding against the airplane, even if Jouppi himself had no criminal involvement in the act of smuggling, it makes no sense that the forfeiture of Jouppi's plane would somehow become "excessive" for Eighth Amendment purposes based on the additional fact that Jouppi *was himself* complicit in the act of smuggling (a fact that the State proved beyond a reasonable doubt).

I therefore interpret *Bajakajian* to mean that when the forfeiture of a ship or an airplane is imposed as part of a defendant's criminal sentence for smuggling — *i.e.*, when the same forfeiture would have justified under traditional *in rem* forfeiture principles, even if the owner was not personally complicit in the smuggling — then the forfeiture is not "grossly disproportional" to the gravity of the offense.

For these two reasons, I conclude that the forfeiture of Jouppi's airplane does not constitute an excessive fine for purposes of the Eighth Amendment.

# I

## Introduction to the law of *in rem* forfeitures and *in personam* forfeitures

Before I turn to the substance of my position, I want to explain two terms that I will be using throughout my dissent: "*in rem*" forfeitures and "*in personam*" forfeitures.

Taken together, these two types of forfeitures comprise the category of "statutory forfeitures" — *i.e.*, forfeitures that did not exist under English common law but rather are the result of legislative enactments.

"*In rem*" *forfeitures*. The first type of statutory forfeiture is the *in rem* forfeiture. The Latin phrase "*in rem*" means "against a thing",[4] and this phrase is used to describe a civil forfeiture action in which the government "sues" a piece of property, claiming that the property is forfeit either because it is contraband or because it has been used — by anyone, no matter who — to commit or facilitate an act of smuggling, or some other circumvention of the revenue laws, or for any other purpose that has been declared unlawful by the relevant forfeiture statute.

For the government, an *in rem* forfeiture proceeding offers several significant advantages. First, because (legally speaking) the government's claim is against the *thing to be forfeited*, it does not matter whether the government can identify the specific person or persons who used the property to violate the law, nor does it matter whether the government can obtain personal jurisdiction over those lawbreakers, as long as the offending piece of property is in the government's possession. Likewise, it does not matter whether the government can identify the person or persons who own the property to be forfeited, nor does it matter whether the government can obtain personal

---

[4] *Black's Law Dictionary*, Pocket Edition (1996), p. 319.

jurisdiction over those owners, nor does it matter whether the government can prove that any of those owners are criminally responsible for the violation of law that justifies the forfeiture.[5]

All the government must prove is that *someone* (no matter who) used the property to commit or facilitate the violation of the law. And, because an *in rem* forfeiture proceeding is a civil proceeding, the government need only prove this fact by a preponderance of the evidence.

Once the government commences an *in rem* forfeiture proceeding, all persons claiming an interest in the property (owners, mortgage-holders, etc.) are allowed to contest the proposed forfeiture. However, at common law, the only real defense to a proposed *in rem* forfeiture was for the property owner(s) to show that their property was not involved in the unlawful activity alleged by the government. If the property was, in fact, involved in the unlawful activity, then it didn't matter whether the property owners were themselves innocent of wrongdoing.

As a matter of United States constitutional law, this principle remains true to this day: the innocence of the owners is no defense. See the United States Supreme Court's decision in *Calero-Toledo v. Pearson Yacht Leasing Company* (1974),[6] and the Court's later decision in *Bennis v. Michigan* (1996)[7] — where the Court acknowledged that equitable considerations might favor an "innocent owner" defense, but the Court nevertheless declared that the forfeiture of innocent owners' property was "too firmly

---

[5]   *See United States v. Ursery*, 518 U.S. 267, 291–92; 116 S.Ct. 2135, 2149; 135 L.Ed.2d 549 (1996).

[6]   *Calero-Toledo v. Pearson Yacht Leasing Company*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

[7]   *Bennis v. Michigan*, 516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996).

fixed in the punitive and remedial jurisprudence of [this] country to be now displaced."[8]

But while there is no defense available to innocent owners under English and American *common law*, there is nonetheless a long tradition of allowing such a defense under American *statutory* law. Even the earliest federal forfeiture statutes enacted by the 1st United States Congress contained provisions that allowed owners to obtain a mitigation or complete remission of the forfeitures imposed for smuggling or other customs violations (*e.g.*, the forfeitures of sailing vessels and/or merchandise) if the owners could show that the forfeiture "was incurred without wilful negligence or any intention of fraud" on their part. [9]

At this point, I should note that the term "innocent owner" is a little misleading. Under federal and state remission statutes, it is generally *not* enough for a property owner to show that they are "innocent" in the sense that they were not complicit in the unlawful activity that justifies the forfeiture. Instead, a property owner must show that they are "hyper-innocent" — not only innocent of wrongdoing, but *also* non-negligent regarding the possibility that their property would be used for the unlawful purpose. In other words, not only must the property owner show that they were not involved in the unlawful activity, but they must also show that they had no reason to think that their property was going to be put to this unlawful use, or that they did

---

[8]     *Bennis*, 516 U.S. at 453, 116 S.Ct. at 1001.

[9]     See Statutes at Large, 1st Congress, second session, chapter 12 (May 26, 1790) ("An Act to provide for mitigating or remitting the forfeitures and penalties accruing under the revenue laws"). Likewise, see Statutes at Large, 1st Congress, third session, chapter 15 (March 3, 1791), a customs act regulating distilled spirits (both "imported from abroad" and "distilled within the United States"); section 43 of this act allowed the owner of a vessel to apply for a mitigation or remission of the forfeiture if they could show that the forfeiture "was incurred without wilful negligence, or any design or intention of fraud".

everything reasonably possible to prevent their property from being put to the unlawful use.

This statutory tradition of forfeiture remission for hyper-innocent owners continues to this day: Both Congress and the state legislatures have enacted provisions that allow hyper-innocent owners to obtain remissions of *in rem* forfeitures.

For instance, in the wake of the Supreme Court's decision in *Bennis v. Michigan*, Congress enacted the federal Civil Asset Forfeiture Reform Act of 2000 (CAFRA), codified at 18 U.S.C. § 983(d). This statute allows property owners to obtain a remission of most federal forfeitures if they prove either (1) that they did not know of the unlawful conduct giving rise to the forfeiture, or (2) that, upon learning of the unlawful conduct, they did all that reasonably could be expected under the circumstances to terminate the unlawful use of their property. [10]

Similarly, the Alaska statute at issue in Jouppi's case, AS 04.16.220, allows innocent property owners (and other interest-holders) to obtain a remission of a forfeiture imposed for alcohol smuggling if they show (1) that they were not complicit in the smuggling, (2) that they had no reason to believe that their property would be used in violation of the law, and (3) that they had no reason to believe that the person who was using their property had committed other violations of the alcohol laws contained in Title 4 of the Alaska Statutes. See AS 04.16.220(e) and (f).

(In Alaska, this defense for hyper-innocent owners is not just statutory; it is required by the due process clause of the Alaska constitution. *See State v. Rice*, 626 P.2d 104, 114 (Alaska 1981), holding that a forfeiture violates the Alaska guarantee of substantive due process if the owner of the property "has done all that reasonably could be expected to prevent [its] illegal use".)

---

[10] 18 U.S.C. § 983(d)(2).

*"In personam" forfeitures*. The second type of statutory forfeiture is the "*in personam*" forfeiture. The Latin phrase "*in personam*" means "against a person",[11] and this phrase is used to describe a forfeiture that is imposed as part of a defendant's sentence in a criminal proceeding, when the relevant penalty statutes authorize the forfeiture of property as a punishment for the crime.

Obviously, as a pre-condition to any *in personam* forfeiture, the government must prove (beyond a reasonable doubt) that the defendant is criminally accountable for the violation of law that authorizes the forfeiture. But in addition, as is true with *in rem* forfeitures, the government must prove either that the property to be forfeited is contraband, or that the property was used to commit or facilitate the violation of the law.

However, *in personam* forfeitures differ from *in rem* forfeitures in two key respects.

First, whenever a defendant is subject to an *in personam* forfeiture, the defendant (by definition) has already been found guilty of committing the related crime. Thus, the defendant cannot obtain remission of the forfeiture by claiming to be an innocent, non-negligent property owner.

If the sentencing judge has the *discretion* to impose the *in personam* forfeiture, the defendant may still argue that, even though they have been found guilty, the facts of their case do not warrant the imposition of a forfeiture, or at least not the entire authorized forfeiture. But if the forfeiture is a *mandatory* component of the defendant's sentence, the only defense available to the convicted defendant is to show that their property was not used to commit or facilitate their crime.

---

[11]   *Black's Law Dictionary*, Pocket Edition (1996), p. 318.

Second, because *in personam* forfeitures are imposed as part of the sentence in a criminal case, where the only parties are the government and the defendant, the court that is presiding over the case only has jurisdiction to impose a forfeiture of the *defendant's* interest in the property. This means, as a practical matter, that the court must give notice to any other potential owners or interest holders, allowing them to challenge the *in personam* forfeiture by showing that they, and not the defendant, are the owners of the property, either in whole or in part (according to the nature of their claimed interest). [12]

Additionally, because an *in personam* forfeiture only applies to the defendant's interest in the property, whenever the defendant is not the sole owner of the property, the government will normally be forced to institute a related *in rem* forfeiture proceeding if the government wishes to obtain forfeiture of the entire property.

*The relationship between in rem and in personam forfeitures.* Because *in rem* forfeitures and *in personam* forfeitures have different legal premises and consequences, the law has always viewed them as separate and independent causes of actions. Thus, with respect to any particular piece of property, the government is allowed to pursue either or both types of forfeiture actions.

Moreover, even when a criminal defendant is the owner of the forfeitable property, the government can pursue an *in rem* forfeiture action against the property even after the government has criminally prosecuted the defendant/property owner for the related crime, and vice-versa. For purposes of the double jeopardy clause, an *in rem* forfeiture action against the defendant's property is not a second prosecution nor a

---

[12] See, for instance, Federal Criminal Rule 32.2(b) and its accompanying Advisory Committee Notes (2000), as well as *United States v. Schwimmer*, 968 F.2d 1570, 1580–81 (2nd Cir. 1992).

second punishment. *United States v. Ursery*, 518 U.S. 267, 270–71, 286–88; 116 S.Ct. 2135, 2138, 2146–47; 135 L.Ed.2d 549 (1996).

The Alaska Supreme Court has likewise ruled that an *in rem* forfeiture proceeding is not a "criminal prosecution" within the meaning of Article I, Section 11 of the Alaska Constitution. *Resek v. State*, 706 P.2d 288, 293 (Alaska 1985).

Thus, in *Waiste v. State*, 10 P.3d 1141, 1153–54 (Alaska 2000), the supreme court held that, under the statutes authorizing the forfeiture of fishing vessels used in connection with violations of Alaska's fishing laws, the State can pursue an *in rem* forfeiture of the vessel (1) before any related criminal prosecution, or (2) instead of a criminal prosecution, or (3) in addition to any related criminal prosecution — even if that criminal prosecution has already resulted in the defendant's acquittal.

With this as a prelude, I now turn to the substance of my dissent.


## II

The Alaska legislature has enacted a statute calling for the mandatory forfeiture of airplanes that are used to smuggle alcoholic beverages into rural Alaska. The legislature's purpose in enacting this statute was to deter conduct that was creating a social problem of crisis proportions. Because the legislature's choice was not plainly unreasonable, and because, under *Bajakajian*, the legislature is the branch of government entrusted with choosing the appropriate penalty for a criminal offense, the forfeitures imposed under Alaska's statute are not "grossly disproportional" under the *Bajakajian* test.

In *Bajakajian*, the United States Supreme Court re-affirmed the constitutional principle that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature."[13]

Indeed, when the *Bajakajian* court described the test for determining whether a forfeiture is excessive — the "grossly disproportional to the gravity of the offense" test — the Supreme Court declared that this concept of "gross disproportionality" was intended to incorporate the same analysis that the Court uses when evaluating whether a criminal sentence violates the cruel and unusual punishment clause.[14] The Supreme Court's "cruel and unusual punishment" cases underscore the fact that this proportionality analysis requires courts to give substantial deference to the judgement of the legislature.

*See*, for instance, *Solem v. Helm*, 463 U.S. 277, 289–290; 103 S.Ct. 3001, 3009; 77 L.Ed.2d 637 (1983) ("[C]ourts ... should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes"); *Rummel v. Estelle*, 445 U.S. 263, 282–84; 100 S.Ct. 1133, 1143–44; 63 L.Ed.2d 382 (1980) ("[O]ur Constitution is made for people of fundamentally differing views. ... Penologists themselves have been unable to agree whether sentences should be light or heavy, discretionary or determinate.").

Here, the Alaska legislature has enacted a statute, AS 04.16.220(a)(3), that mandates the forfeiture of any aircraft used to accomplish or facilitate the smuggling of alcoholic beverages into a local option community — although the owner of the property is entitled to remission of the forfeiture if they can show (1) that they were not complicit

---

[13]  *Bajakajian*, 524 U.S. at 336, 118 S.Ct. at 2037, citing *Solem v. Helm*, 463 U.S. 277, 288; 103 S.Ct. 3001, 3008; 77 L.Ed.2d 637 (1983), and *Rummel v. Estelle*, 445 U.S. 263, 271; 100 S.Ct. 1133, 1137–38; 63 L. Ed. 2d 382 (1980).

[14]  *Id.*, 524 U.S. at 336, 118 S.Ct. at 2037.

in the smuggling and, additionally, (2) that they had no reason to believe that their aircraft, watercraft, or vehicle would be put to this unlawful use. [15]

The forfeitures imposed under AS 04.16.220(a)(3) can often constitute a substantial monetary hardship to the owner of the aircraft. But the legislative history of this forfeiture statute shows that the Alaska legislature intended the penalty to be severe — because the legislature was responding to, and attempting to punish and deter, smuggling transactions that were creating a social crisis in rural Alaska.

As I am about to explain in some detail, the forfeiture provisions of AS 04.16.220(a)(3) were a reasoned legislative response to a serious social problem. Thus, under a *Bajakajian* analysis, the forfeitures imposed under this statute are not "grossly disproportional" to the gravity of the offense.

*(a) Alaska's historic use of forfeitures to enforce our smuggling and poaching statutes, and to deter the violation of those laws*

Alaska has always been a vast and thinly populated region where it is difficult for law enforcement officers to detect and prevent smuggling and poaching. Historically, our geography has been an open invitation to smugglers, as well as those who would poach Alaska's fish, game, birds, and marine mammals.

The legislative response to this problem — virtually from the time the United States first acquired Alaska in 1867 — has been to enact laws that call for the forfeiture of the marine vessels and (later) the aircraft used to commit smuggling and poaching offenses.

Sometimes, the statutes called for these forfeitures to be imposed *in rem* — that is, imposed in a civil forfeiture proceeding where the government "sues" the

---

[15]   *See* AS 04.16.220(e) and (f).

property itself, and anyone claiming an interest in the property is allowed to contest the proposed forfeiture. Other times, these statutes called for the forfeitures to be imposed *in personam* — that is, imposed as part of a defendant's sentence in a criminal prosecution for smuggling or poaching. And often the statutes authorized both kinds of forfeitures.

For example, in 1868 and again in 1870, Congress enacted statutes that prohibited the unauthorized hunting of seals and other fur-bearing mammals in Alaska. *See* sections 173 and 178 of Part I ("The Penal Code") of the Carter Code of 1900 (Thomas H. Carter, *The Laws of Alaska*). These anti-poaching statutes authorized a combination of imprisonment, fines, and forfeitures as criminal penalties for these offenses. Specifically, both statutes declared that "every person guilty [of killing these fur-bearing mammals] shall, for each offense, be fined not less than two hundred nor more than one thousand dollars, or imprisoned not more than six months, or both; and all vessels, their tackle, apparel, furniture, and cargo, found engaged in violation of this section shall be forfeited[.]"

(The words "tackle", "apparel", and "furniture" have specialized meanings in admiralty law. "Tackle" refers to the ship's rigging, "apparel" refers to the ship's sails, and "furniture" refers to the anchors and the numerous other tools and maritime utensils for use on the ship. The ship's cargo and ballast were separate — which is why the two forfeiture statutes separately mention the ship's cargo. *See* Erastus Cornelius Benedict, *Admiralty* (5th ed. 1925), Vol. 1, § 59.)

As can be seen from this list of possible penalties, the forfeiture of the sailing vessel, along with her "tackle, apparel, [and] furniture", was generally the most onerous financial penalty that could be imposed under these two statutes — a penalty far more severe than the authorized fine of $200 to $1000.

Similarly, in 1868, Congress enacted a forfeiture statute to deter the smuggling of alcoholic beverages into the newly acquired District of Alaska. This statute authorized the forfeiture of sailing vessels (again, along with their "tackle, apparel, and furniture and cargo") if the ship was found to be illegally transporting more than $400 worth of alcoholic beverages to Alaska. [16]

Another example of a similar federal forfeiture statute is section 5 of the Act of January 13, 1925 — an act "to establish an Alaska Game Commission to protect game animals, land fur-bearing animals, and birds in Alaska". [17] (This law was carried forward to the eve of Alaska statehood; see the 1949 Compiled Laws of Alaska, Title 39, chapter 6.) One provision of this 1925 act (ACLA 1949, § 39-6-7) required the forfeiture of all "boats, aircraft, wagons or other vehicles, dogs, sleds, and other paraphernalia" that were used in, or in aid of, any violation of the Act's provisions regulating animals, birds, and game fish within the Territory of Alaska.

Like the forfeiture statute at issue in Jouppi's case, this 1925 federal statute declared that these forfeitures of "boats, aircraft, wagons, [and] other vehicles" could be imposed "[either] upon conviction of the offender or upon judgment of a [federal] court ... that the [boats, aircraft, or vehicles] were being used ... in violation of this Act". In other words, these forfeitures could either be imposed *in rem* (*i.e.*, in a civil forfeiture proceeding against the property itself) or *in personam* (*i.e.*, as part of the judgement in a criminal case against one or more of the poachers).

After the birth of commercial aviation, many of the forfeiture laws applicable to Alaska were expanded to include the forfeitures of airplanes. For example,

---

[16] *See* Revised Statutes of the United States, § 1955 (enacted July 27, 1868).

[17] This law was enacted by Statutes at Large, 68th Congress, second session, chapter 75, and was initially codified at 43 Stat. 739.

one of the early federal statutes pertaining to the use of airplanes in the Territory of Alaska — the Air Commerce Act of 1926 — authorized the forfeiture of aircraft that were used in connection with any violation of the customs or public health laws. [18]

To this day, Alaska law continues to impose both *in rem* and *in personam* forfeitures for violations of our state's fish and game laws. See, for example, AS 16.-05.195(a), which authorizes the forfeiture of all "guns, traps, nets, fishing gear, vessels, aircraft, other motor vehicles, sleds, and other paraphernalia or gear" used in, or in aid of, any violation of Title 16 or AS 08.54 (the chapter of the Alaska statutes that governs big game guiding), or any regulation adopted under either Title 16 or AS 08.54.

Under AS 16.05.195(a), these forfeitures can either be imposed "upon conviction of the offender in a criminal proceeding" (*i.e.*, imposed *in personam*) or "upon judgment of a court of competent jurisdiction in a proceeding in rem".

*See also* AS 16.05.723 ("Misdemeanor commercial fishing penalties"), [19] AS 16.05.783 ("Same day airborne hunting"), [20] and AS 16.05.905(b). [21]

---

[18] *See* Compiled Laws of Alaska 1949, § 32-1-8(b) — originally enacted as Statutes at Large, 69th Congress, first session, chapter 344 (May 20, 1926), section 11, and codified as 49 U.S.C. § 181.

[19] Subsection (a) of AS 16.05.723 declares that any person who negligently violates any of the commercial fishing laws found in AS 16.05.440 – 16.05.690, or who violates any regulation governing commercial fishing, "is punishable upon conviction by a fine of not more than $15,000 or by imprisonment for not more than one year, or by both. In addition, the court shall order forfeiture of any fish, or its fair market value, taken or retained as a result of the commission of the violation, and the court may forfeit any vessel and any fishing gear, including any net, pot, tackle, or other device designed or employed to take fish commercially, that was used in or in aid of the violation."

[20] Subsection (c) of AS 16.05.783 declares that a person who hunts game on the same day that they traveled by air "[is] upon conviction ... punishable by a fine of not more than $5,000, or by imprisonment for not more than one year, or by both. In addition, the court

(continued...)

The Alaska Supreme Court has expressly recognized that these forfeitures are an important mechanism for enforcing our state's fish and game laws. See *F/V American Eagle v. State*, 620 P.2d 657, 671–72 (Alaska 1980), where the supreme court upheld both the forfeiture of more than $100,000 in money (representing the value of illegally harvested crab) *and* the forfeiture of the owners' $350,000 interest in the commercial fishing vessel that was used to illegally harvest the crab.

At this point, I wish to respond to an assertion that is made in this Court's majority opinion. My colleagues assert that the forfeiture statute in Jouppi's case, AS 04.16.220(a)(3), is an outgrowth of, or is patterned after, the anti-drug forfeiture statutes that first began to appear in this country in the 1970s.

My colleagues reach this conclusion based on the date of the statute (*i.e.*, because it was enacted after the 1970s), and also based on the fact that the statute calls for the forfeiture of vessels and aircraft used to smuggle alcoholic beverages (apparently, because alcohol can be characterized as a drug).

According to my colleagues, these two factors distinguish AS 04.16.220 from the traditional customs and revenue *in rem* forfeiture statutes which existed before the 1970s — statutes which, according to *Bajakajian*, are exempt from the excessive fines clause of the Eighth Amendment. Instead, my colleagues suggest that

---

[20]   (...continued)
may order the aircraft and equipment used in or in aid of a violation of this section to be forfeited to the state."

[21]   This statute declares that any alien (*i.e.*, any citizen of another country) who has not been lawfully admitted to the United States and who engages in commercial fishing or in the taking of marine mammals in the territorial waters of Alaska "is guilty of a misdemeanor, and upon conviction is punishable by ... confiscation and forfeiture of the fishing vessel used in the violation, or by imprisonment for not more than one year, or by fine of not more than $10,000, or by all or any two of the foregoing punishments."

AS 04.16.220 is more akin to the modern anti-drug forfeiture statutes which, according to *Bajakajian*, are constrained by the excessive fines clause.

But the question here is not whether AS 04.16.220 was enacted after 1970, nor is the question whether alcohol might be considered a "drug" for purposes of the anti-drug laws. Rather, the question (to quote *Bajakajian*) is whether the forfeiture provisions of AS 04.16.220(a)(3) "blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture" by expanding the scope of forfeitures beyond the types of forfeitures that were traditionally imposed prior to the 1970s. [22]

Ever since Alaska was acquired by the United States in 1867, Alaska law has employed both *in rem* forfeitures and *in personam* forfeitures of vessels and (later) airplanes to punish and deter the smuggling of alcoholic beverages (as well as to punish and deter other customs violations and poaching). See, for example, the 1871 decision in *The Louisa Simpson*, 1 Alaska Fed. 50, 2 Sawyer 57, 15 F.Cas 953 (D. Or. 1871), where a schooner was forfeited to the federal government because it was used to smuggle distilled spirits valued at more than $400 into the District of Alaska (in violation of United States Revised Statutes § 1955, enacted in 1868).

The forfeiture statute at issue in Jouppi's case, AS 04.16.220, is not part of the expanded, non-traditional use of forfeitures that accompanied the "war on drugs" in the 1970s. Rather, this statute is a descendant of Alaska statutes which, since the 1860s, have imposed both *in rem* and *in personam* forfeitures of vessels and aircraft to deter smuggling and poaching.

(I address this point further in Section III of this dissent, where I analyze the United States Supreme Court's decision in *Bajakajian*.)

---

[22] *Bajakajian*, 524 U.S. at 331 n. 6, 118 S.Ct. at 2035 n. 6.

*(b) The history of the statute at issue in Jouppi's case, AS 04.16.220*

The forfeiture statute that applies to Jouppi's airplane, AS 04.16.-220(a)(3)(C), was first enacted by the Alaska legislature in 1980.[23] The legislature took this action in the aftermath of a series of studies which highlighted the massive problems that alcoholism and alcohol-related crime posed for the State of Alaska.

Three of these studies are described in *Harrison v. State*, 687 P.2d 332 (Alaska App. 1984):

> Alcohol abuse has been and continues to be a problem in Alaska. A comprehensive study of this issue was released in 1977 by the Analysis of Alcohol Problems Project. Several of the study's conclusions illustrated the extent of alcohol problems in Alaska. For example, Alaska's rate of death due directly to alcoholism increased 153% from 1959 to 1975, and Alaska's alcoholism mortality rate in 1975 was 418% higher than the national average. Analysis of Alcohol Problems Project, *Working Papers: Descriptive Analysis of the Impact of Alcoholism and Alcohol Abuse in Alaska, 1975*, vol. V at 14 (1977). From 1958 to 1975, Alaska's rate of annual consumption increased at almost twice the rate of the national average. *Id.* at 42. The total economic cost of alcoholism and alcohol abuse to Alaska in 1975 was reported to be 131.2 million dollars. *Id.* at 32. The study noted that the impact of alcohol-related problems was greater in rural areas. *Id.* at 4.
>
> In 1976, the Governor's Commission on the Administration of Justice concluded that crime in Alaska is significantly related to the excessive and unregulated consumption of alcohol. Governor's Commission on the

---

[23] *See* SLA 1980, ch. 131, § 3.

Administration of Justice, *Standards and Goals for Criminal Justice* at 41 (1976).  The Commission noted that, according to the National Council on Alcoholism, one out of every ten Alaskans is an alcoholic. *Id.*  The Commission recommended that rural villages be allowed to control alcoholic beverages. *Id.* at 14.

In 1980, the Alaska Judicial Council published a report entitled *Alaska Felony Sentences: 1976–1979*.  The report found a significant relationship between the use of alcohol and criminal behavior.  This association was most significant in rural areas of the state where, according to the Council, 77.9% of violent crimes and 55.6% of property crimes were committed under the influence of alcohol.  Alaska Judicial Council, *Alaska Felony Sentences: 1976–1979* at 45–48, 65–67 (1980).

*Harrison*, 687 P.2d at 335.

A fourth study of the problems posed by alcohol abuse and alcohol-related crime in Alaska was conducted by the National Council on Alcoholism.  The Alaska Supreme Court described the conclusions of this study in *Abraham v. State*, 585 P.2d 526 (Alaska 1978):

In recent years, excessive use of alcohol with its tragic consequences has commanded the attention of the citizens of this state.  ...  Since 1972[,] millions of dollars have been spent [by the State of Alaska for the treatment of alcoholics and intoxicated people].  In addition, statistics demonstrate that a high percentage of crimes are committed while the offenders are under the influence of intoxicating liquor. Recently, the National Council on Alcoholism submitted an "Executive Summary of Alcohol Misuse and Alcoholism in Alaska."  In part, this report states ... [that] 64% of all criminal homicides, 34% of all forcible rape cases, and 41%

of aggravated assault cases have been linked to alcohol abuse[.]

. . .

[But it] is the alcohol-related misdemeanors which have the greatest impact on the criminal justice system. ... [M]isdemeanor arrests for alcohol-related offenses account for 39% of all arrests statewide, and about 60% of all misdemeanor filings in district court, and [these misdemeanor criminal proceedings] cost the criminal justice system a total of about $11.76 million in 1975. This figure represents more than three-quarters (77%) of the total cost of alcohol-related crime to the criminal justice system ... . These dollar figures do not include any cost to victims, or economic consequences of the criminal activity, just the costs to the enforcement, prosecution, court and corrections components of the criminal justice system. The total cost of ... alcohol-related crime amounts to slightly over 30% of the [State of Alaska's] total criminal justice system expenditures.

*Abraham*, 585 P.2d at 532 n. 19.

Two years after the supreme court issued its decision in *Abraham*, the Alaska legislature enacted this state's first local option statutes — statutes that gave communities the authority to limit or ban the sale of alcoholic beverages, or to totally prohibit the importation of these beverages into the community.[24] And to give teeth to these communities' efforts to stem the flow and abuse of alcoholic beverages, the legislature enacted the first version of AS 04.16.220 — a statute that gave sentencing courts the authority to order the forfeiture of any airplane, vessel, or vehicle used to circumvent these local option laws.[25]

---

[24] *See* SLA 1980, ch. 131.

[25] *See* SLA 1980, ch. 131, § 3.

Six years later, the Alaska legislature expanded the authority of local communities to control alcoholic beverages — this time, by enacting a statute that authorized municipalities and villages to completely ban the possession of alcoholic beverages. [26]

The legislature explained its action in a series of findings contained in section 1 of this 1986 session law. Among its findings, the legislature noted that the dangers to public health and safety arising from alcohol abuse were particularly acute in rural areas of the state. Because rural communities are small and isolated, they often lack adequate health care facilities, and they often lack adequate law enforcement. In addition, the legislature found that neither the state government nor the state's rural community governments could afford the economic cost of alcohol abuse. [27]

Just as important, the legislature found that the prior local option statutes enacted in 1980 had fallen short of achieving their purpose. The 1980 local option statutes authorized communities to prohibit the sale and importation of alcoholic beverages, but not the personal possession of alcoholic beverages. But in 1986, the legislature concluded that communities also needed the authority to totally ban personal possession of alcoholic beverages — that, without such a ban, the problems associated with alcohol abuse would continue because, "in communities that have chosen to ban the sale and importation of alcohol, most drinking takes place in private homes". [28] The

---

[26] SLA 1986, ch. 80, § 2.

[27] SLA 1986, ch. 80, § 1, subsections (2), (6), & (8).

[28] SLA 1986, ch. 80, § 1, subsection (7).

legislature therefore enacted a new statute which authorized local communities to completely ban the possession of alcoholic beverages. [29]

(Even after the legislature expanded the local option laws in 1986, alcohol abuse and alcohol-related crime continued to plague Alaska — and, in particular, rural Alaska. The extent of this problem was explored by the Anchorage Daily News in its 1988 Pulitzer prize-winning series, "A People in Peril".)

Given this history, it is clear that the forfeiture provisions of AS 04.16.-220(a)(3)(C) were aimed directly at offenders like Jouppi.

In 1980, when our legislature initially authorized the forfeiture of aircraft, watercraft, and motor vehicles used to facilitate the smuggling of alcoholic beverages into local option communities, the decision whether to impose these forfeitures was left to the sentencing court's discretion. [30] But twenty-four years later, the legislature revisited this issue. [31] Under the current version of the statute, the forfeiture of airplanes has become mandatory, while the forfeiture of watercraft and motor vehicles is mandatory under certain conditions. [32]

---

[29] SLA 1986, ch. 80, § 2. This new statute, AS 04.11.498, was repealed in 1995 when the legislature consolidated all the different local options into a single statute, AS 04.11.491. *See* SLA 1995, ch. 101, § 69. The provision authorizing a community to ban all possession of alcoholic beverages was moved to subsection (a)(5) of AS 04.11.491.

[30] *See* former AS 04.16.220(a)(3) (1980).

[31] *See* SLA 2004, ch. 124, § 11 (the first version of what is now AS 04.16.220(a)(3)(C)) and §§ 9–11 (the remission provisions for certain innocent owners).

[32] AS 04.16.220(i)(2) declares that the forfeiture of a bootlegger's watercraft or motor vehicle is mandatory if the defendant has a prior conviction for bootlegging or for a violent felony, or if the defendant was on felony probation or felony parole, or if the defendant has been convicted of manufacturing. selling, or possessing alcoholic beverages for sale without a license and the amount of alcohol involved was at least twice the amount specified in

(continued...)

(The legislature allows certain innocent owners to obtain remission of these forfeitures even if the forfeitures are otherwise mandatory. AS 04.16.220(e) and (f) give property owners and other interest holders the right to seek "relief ... in the nature of remission of the forfeiture" if they show that they are innocent of any complicity in the smuggling and, in addition, they show that they had no reason to believe that the aircraft, watercraft, or motor vehicle would be used for this unlawful purpose. As I noted in the introductory section of this dissent, this remission for "hyper-innocent" owners — *i.e.*, owners who are both personally innocent of criminal wrongdoing *and* non-negligent regarding the possibility that someone else would put their property to criminal use — is required under the due process clause of the Alaska constitution. See *State v. Rice*, 626 P.2d 104, 114 (Alaska 1981), holding that a forfeiture violates the guarantee of substantive due process if the owner of the property "has done all that reasonably could be expected to prevent [its] illegal use".)

The Alaska legislature's purpose in enacting these new forfeiture provisions was to create more severe penalties for bootlegging offenders (including those who would turn a blind eye to the alcohol smuggling). See the letter dated April 30, 2004, from Assistant Attorney General David Marquez to the co-chair of the House Finance

---

[32] (...continued)
AS 04.11.010(c) as creating a presumption that the alcoholic beverages were possessed for purposes of sale.

Nevertheless, the very next subsection of the statute, AS 04.16.220(j), declares that a court is not required to impose a forfeiture of the watercraft or motor vehicle if (1) the watercraft or motor vehicle is the sole means of transportation for a family residing in a village, and (2) the court is able to impose conditions that will prevent the defendant's use of the watercraft or vehicle, and either (3a) a member of the family would be entitled to remission of the forfeiture if the family member had an ownership or security interest in the watercraft or vehicle, or (3b) the family member was unable, as a practical matter, to stop the act of bootlegging that rendered the watercraft or vehicle subject to forfeiture.

Committee ("Highlights of [the] Governor's 2004 Crime Bill", CSSB 170.)  See also the "Sectional Summary for Senate Bill 170", dated April 5, 2004, which declared that the bill would "improve the law" by "strengthen[ing the] forfeiture law for vehicles, watercraft, and aircraft used to bootleg alcohol".

### (c)  My conclusion based on this history

The legislative history of AS 04.16.220 — especially, the history of the forfeiture provisions found in this statute — shows that the Alaska legislature viewed the mandatory forfeiture of aircraft as a severe but necessary penalty to punish and deter the smuggling of alcoholic beverages into rural Alaska.  This same history also demonstrates that the legislature's decision to impose these forfeitures was based on legitimate concerns about the social dangers posed by this bootlegging — and that the mandatory forfeiture of the airplanes used for bootlegging constitutes a reasonable legislative response to these social dangers.

Finally, the history of forfeiture statutes in Alaska (beginning in 1868) shows that, over the past 150 years, federal and Alaska law have imposed both *in rem* and *in personam* forfeitures of vessels and airplanes used to commit smuggling and poaching in Alaska.  Historically, the forfeiture of these vessels and airplanes has been the most onerous financial penalty that can be imposed for these crimes — a financial penalty that is generally far more severe than the fines that could be imposed for the same violations.

Indeed, this Court has expressly recognized that these forfeitures are an important component of our state's anti-smuggling and anti-poaching laws — precisely because these forfeitures are generally a much greater penalty than the fines that might be imposed.

In *Jordan v. State*, 681 P.2d 346 (Alaska App. 1984), the defendant was convicted of taking a black bear "same day airborne" (*i.e.*, on the same day that the defendant had traveled by airplane).[33] As part of Jordan's sentence, the court ordered the forfeiture of $10,000 of his interest in the airplane. On appeal, Jordan argued that this $10,000 forfeiture was excessive because it was ten times the maximum fine he could have received for the offense (a fine of $1000).

This Court rejected the defendant's excessiveness argument because we concluded that the forfeitures imposed by the statute were intended to work *separately* from any fine. Here is the relevant passage from *Jordan*:

> Dr. Jordan appeals his sentence as excessive. ... Since the maximum fine allowed is $1,000, ... Jordan contends that the [forfeiture] may be illegal. We disagree. Our review of [the lower court's] sentencing remarks ... makes it clear to us that the loss of the airplane was not intended as a fine but as a forfeiture. ... [In addition,] Dr. Jordan contends that even if [it was] legal, the forfeiture of his plane was excessive under the circumstances. The trial court determined that the forfeiture of the airplane was necessary for the purpose of deterring [Jordan] and others similarly situated from committing same day airborne violations. We agree. Since the airplane was an instrumentality by which Jordan committed the offense in question, its forfeiture was appropriate under the circumstances.

*Jordan*, 681 P.2d at 350.

*Bajakajian* re-affirms two related legal principles: the legislature normally decides what penalties are appropriate for a particular criminal offense; and if someone

---

[33] At the time of Jordan's offense, the prohibition on taking game same day airborne was found in a hunting regulation. It is now found in a statute: AS 16.05.783.

challenges the legislature's prescribed penalty as unconstitutionally severe, the courts must give substantial deference to the legislature's decision.

Here, the forfeiture of Jouppi's airplane is the type of forfeiture that has traditionally been employed in Alaska to deter smuggling and poaching — and the pertinent legislative history of the forfeiture statute shows that the Alaska legislature had substantial and valid reasons for enacting this provision.

I acknowledge that this penalty is severe. According to the record in Jouppi's case, the value of his airplane (approximately $95,000) is almost ten times the maximum fine that could have been imposed for his offense. But because this Court concluded in *Jordan* that the poaching of a black bear justified a forfeiture that was ten times the amount of the maximum fine for that offense, I have no doubt that Jouppi's crime — smuggling alcoholic beverages into a dry community, an act that threatens the health and safety of Alaska's people — justifies a similarly proportioned forfeiture.

I therefore conclude that, under the *Bajakajian* test, the forfeiture of Jouppi's airplane cannot be "grossly disproportional" to the gravity of Jouppi's offense.

III

*Bajakajian* holds that the excessive fines clause of the Eighth Amendment does not apply to the *in rem* forfeitures that have traditionally been used to enforce smuggling and revenue laws — *i.e.*, forfeitures of ships, airplanes, motor vehicles, and other property used to commit or facilitate smuggling or the evasion of revenue laws, even when the owner of the property was not complicit in the customs or revenue violation. The statute in Jouppi's case authorizes these same kinds of *in rem* forfeitures for the act of smuggling alcoholic beverages into a local option community; *see* AS 04.16.220(d)(2) and 220(g).

2734

Here, the forfeiture of Jouppi's airplane was imposed as part of Jouppi's sentence in his criminal case under section 220(d)(1) of the statute, rather than in a separate *in rem* action against the airplane itself under section 220(d)(2) of the statute. Nevertheless, the monetary value of this forfeiture, and the consequences of this forfeiture to Jouppi, are the same as if Jouppi had suffered a traditional *in rem* forfeiture of his airplane under section 220(d)(2) because it was used for smuggling. Therefore, the forfeiture of Jouppi's airplane is not "grossly disproportional" under *Bajakajian*.

### (a) The types of property forfeiture that existed under English law and American colonial law

As the United States Supreme Court explained in *Calero-Toledo v. Pearson Yacht Leasing Company*,[34] three distinct types of property forfeiture existed under English law (and American colonial law) at the time of the American Revolution.

First, there was the doctrine of "deodand", which called for the forfeiture of any animal or inanimate object that accidentally caused the death of a person.[35] The ownership of the animal or object was irrelevant: the animal or object was forfeit because it had caused someone's death. As a legal matter, the animal or object was considered to be "guilty" or "at fault", regardless of who owned it.

---

[34] 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

[35] *Pearson Yacht Leasing*, 416 U.S. at 680–81, 94 S.Ct. at 2090–91.

Next, there was the doctrine of "forfeiture of estate". Under this doctrine, anyone attainted of treason or a felony automatically lost the right to own property — any kind of property. [36]

As *Pearson Yacht Leasing* explains, a "forfeiture of estate" did not actually involve any judicial forfeiture proceeding. That is, the government did not have to institute *in rem* proceedings against the defendant's property, nor did the government have to seek an *in personam* forfeiture of the defendant's property as part of the defendant's criminal sentence. Rather, under the "forfeiture of estate" doctrine, any person attainted of treason or a felony automatically lost their right to own *any* property by virtue of their criminal conviction. [37] Once a person became "attainted" (*i.e.*, once the person's conviction for treason or a felony became final, without possibility of appeal or reprieve), [38] the entirety of the defendant's estate — all of their real property, their chattel property, their rights of entry or use, and every other thing of value belonging to the defendant — essentially became *ownerless* by operation of law, and it all escheated to the Crown or to the defendant's feudal overlord.

---

[36] The common law justified this total deprivation of property on the ground that the ownership of property was a right derived from society, and that a person lost this right when they violated the most serious of society's laws. *See* Blackstone's *Commentaries on the Laws of England*, Book 4 ("Of Public Wrongs"), chapter 29, p. 375.

[37] *Pearson Yacht Leasing*, 416 U.S. at 682, 94 S.Ct. at 2091.

[38] As explained in Blackstone's *Commentaries*, Book 4, chapter 29, pp. 373–74, the word "attainder" had a specialized meaning in English law. An "attainder" was not strictly equivalent to a "conviction"; rather, a person became "attainted" of treason or a felony only after the post-judgement remedies available at common law (*e.g.*, arrest of judgement, attack on the indictment, royal pardon, or benefit of clergy) were exhausted. At that point, the judgement of conviction became truly final, and the person was "attainted".

The third type of forfeitures recognized under English law were the "statutory" forfeitures — that is, all the *in rem* and *in personam* forfeiture provisions enacted by Parliament or by the American colonial legislatures.

Chief among these were the forfeitures imposed for violations of the customs and revenue laws — forfeitures that we would recognize today either as *in rem* forfeitures (if the forfeiture was imposed in a civil or admiralty proceeding against the property itself) or as *in personam* forfeitures (if the forfeiture was imposed as part of a defendant's sentence in a criminal prosecution for violating the customs or revenue laws).

During the century before the American Revolution, both the English Parliament and the individual American colonial legislatures enacted customs and revenue laws that called for the forfeiture of sailing ships and other vessels used to transport contraband or to otherwise aid a violation of the customs and revenue statutes. [39] And almost immediately after the federal Constitution was adopted in 1789, Congress took action to make sure that the ships involved in federal customs and revenue offenses were made subject to the same types of forfeiture. [40]

---

[39] *Pearson Yacht Leasing*, 416 U.S. at 683, 94 S.Ct. at 2091–92. See also the lengthy discussion of New York's colonial forfeiture laws (laws that imposed forfeiture of the sailing ships and other vessels employed to violate that colony's customs and revenue laws) in *C. J. Hendry Company v. Moore*, 318 U.S. 133, 145–48; 63 S.Ct. 499, 505–09; 87 L.Ed. 663 (1943).

[40] *Pearson Yacht Leasing*, 416 U.S. at 683, 94 S.Ct. at 2092.

### (b) Federal forfeiture statutes from 1789 to the mid-1900s

Nowadays, income taxes and payroll taxes generate more than 90% of our federal government's revenue.[41] But it was not always this way — because these taxes did not exist for most of our nation's history. Between 1789 (when the federal government began operation) and 1913 (when the United States Constitution was amended to authorize a federal income tax), the federal government was funded almost exclusively by customs duties, supplemented by excise taxes on alcoholic beverages, tobacco products, and other goods.[42]

Because customs revenues were the financial lifeblood of the federal government, the first federal Congress acted quickly to establish import duties on a whole range of goods.[43] But it was one thing to enact customs duties, and quite another to collect these duties.

The 1700s were the "golden age of smuggling".[44] Entire coastal and island communities on both sides of the Atlantic depended economically on the proceeds of smuggling. Certain items (such as tea) were so commonly smuggled that the consump-

---

[41]   https://www.nationalpriorities.org/budget-basics/federal-budget-101/revenues/ .

[42]   https://en.wikipedia.org/wiki/History_of_taxation_in_the_United_States. *See also* https://en.wikipedia.org/wiki/Tariff_in_United_States_history .

[43]   *See* Statutes at Large, 1st Congress, first session, chapter 2 (July 4, 1789) ("An act for laying a Duty on Goods, Wares, and Merchandises imported into the United States"), and Statutes at Large, 1st Congress, first session, chapter 3 (July 20, 1789) ("An act imposing Duties on Tonnage" [*i.e.*, a ship's carrying capacity]).

[44]   *See*, *e.g.*, https://www.bbc.co.uk/bitesize/guides/z2cqrwx/revision/3;  and https://www.ctexplored.org/connecticut-in-the-golden-age-of-smuggling/,  and https://en.wikipedia.org/wiki/Smuggling .

tion of the smuggled goods far exceeded the consumption of the corresponding lawfully taxed goods. [45]

Customs duties and restrictions are inherently difficult to enforce. When a cargo ship contains smuggled goods, the contraband goods are typically hidden among large quantities of other, lawfully shipped goods. Moreover, in the late 1700s, the long coastline of the United States was thinly inhabited, and it afforded ample opportunities for people who wished to evade the new nation's customs duties.

To enforce the new (and crucial) customs duties, the 1st United States Congress enacted legislation that specified the ports where ships were required to land, specified the manner in which ships' masters were required to report their cargo, and required ships' masters to allow their vessels to be inspected by customs agents. [46] And, to give teeth to these enforcement efforts, the 1st Congress passed legislation that (1) imposed fines on people who tried to evade the customs duties, (2) authorized the forfeiture of smuggled goods, and (3) authorized the forfeiture of sailing ships, smaller boats, and other conveyances that were used to transport smuggled goods or to off-load them from the ship. [47]

---

[45] *See*, *e.g.*, https://www.bbc.co.uk/bitesize/guides/z2cqrwx/revision/3; and https://www.ctexplored.org/connecticut-in-the-golden-age-of-smuggling/ .

[46] *See* Statutes at Large, 1st Congress, first session, chapter 5 (July 31, 1789) ("An Act to regulate the Collection of Duties imposed by law on the tonnage of ships or vessels, and on goods, wares and merchandises imported to the United States), and Statutes at Large, 1st Congress, second session, chapter 35 (August 4, 1790) ("An Act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships or vessels").

[47] *See* Statutes at Large, 1st Congress, first session, chapter 5 (July 31, 1789), sections 12, 34, & 40; Statutes at Large, 1st Congress, second session, chapter 35 (August 4, 1790), sections 14, 27, 60, & 70.

(These federal forfeiture statutes were patterned on similar British and American colonial forfeiture statutes that had existed long before the United States gained its independence — legislation such as the British Navigation Acts of 1660. [48])

The fines prescribed by Congress's early customs statutes were in the hundreds of dollars. The forfeiture of the smuggled goods themselves might easily amount to a larger penalty, perhaps in the thousands of dollars. But by far, the greatest penalty imposed by these customs statutes was the forfeiture of the sailing ships used to transport the smuggled goods. These ships were subject to forfeiture regardless of the ship's value — and merchant ships at the beginning of the nineteenth century were worth several tens of thousands of dollars (depending on their condition and their "tonnage" or carrying capacity). [49]

---

[48] *See Austin v. United States*, 509 U.S. 602, 612–13; 113 S.Ct. 2801, 2807; 125 L.Ed.2d 488 (1993).

[49] A ship's "tonnage" does not refer to the weight of cargo that a ship can carry, but rather to the *volume* of cargo that the ship can carry. The word "tonnage" derives from the fact that this cargo volume was originally measured by the number of "tuns" (casks of wine) the ship could hold. *See* https://en.wikipedia.org/wiki/Tonnage.

In the 1790s, at the outbreak of the Napoleonic Wars, English merchant ships were selling for between £25 and £40 per ton. *See* https://www.britannica.com/technology/ship/Shipping-in-the-19th-century. Thus, a sailing ship with a 300-ton capacity would sell for between £7500 and £12,000 (between $34,000 and $54,000 at the time), while a ship with a 500-ton capacity might sell for as much as £20,000 (about $90,000). (In the late 1790s, the British pound was worth about $4.50 in United States currency.

*See* https://www.exchangerates.org.uk/articles/1325/the-200-year-pound-to-dollar-exchange-rate-history-from-5-in-1800s-to-todays.html. As a point of comparison, a daily wage of one dollar in 1800 would be equivalent to a daily wage of at least $400 today. *See* https://www.measuringworth.com/calculators/ppowerus/ .

Over the next 150 years (*i.e.*, into the first third of the twentieth century), Congress repeatedly enacted laws that called for the forfeiture of ships and airplanes involved in smuggling, other evasions of the revenue laws, and poaching.

For example, in 1866 (in the immediate aftermath of the Civil War), Congress expanded the use of forfeitures as a means of enforcing the customs statutes, as well as the statutes that imposed federal excise taxes on a wide range of goods (most notably, the taxes on alcoholic beverages). *See* Revised Statutes of the United States, § 3450 (enacted as Statutes at Large, 39th Congress, first session, chapter 184 (July 13, 1866), section 14).

This 1866 legislation — which unexpectedly assumed national prominence a half-century later, following the enactment of Prohibition in 1920[50] — called for the forfeiture of any property associated with the production, smuggling, or any other storage or sale of alcoholic beverages "with intent to defraud the United States of [the applicable excise] tax".

Like the forfeitures imposed for customs violations, the forfeitures for excise-tax evasion were wide-ranging. According to the 1866 statute, the property subject to forfeiture included "every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all [other] things used in the removal or for the deposit or concealment [of alcoholic beverages for which the proper tax had not been paid]."[51] And, like the forfeitures imposed under the customs statutes, the value of the forfeitures imposed for violation of the excise-tax laws had no correlation to the amount of tax revenue that the government had lost.

---

[50] *See, e.g., J.W. Goldsmith, Jr. – Grant Company v. United States*, 254 U.S. 505, 41 S.Ct. 189, 65 L.Ed. 376 (1921).

[51] Revised Statutes of the United States, § 3450.

As I already noted in an earlier section of this dissent, Congress enacted a similar forfeiture statute two years later, in 1868, to deter the smuggling of alcoholic beverages into the newly purchased District of Alaska. This federal statute authorized the forfeiture of sailing ships (along with their "tackle, apparel, and furniture and cargo") if the ship was found to be illegally transporting more than $400 worth of alcoholic beverages to the District of Alaska. [52]

And in 1935, Congress enacted a new forfeiture law — 49 Stat. 518, August 5, 1935, now codified as 19 U.S.C. § 1703 — which authorized the forfeiture of "any vessel ... built, purchased, fitted out[,] ... or held" anywhere in the world "for the purpose of being employed to defraud the revenue or to smuggle any merchandise into the United States". Under the terms of this law, "[whenever] any vessel ... shall be found, or discovered to have been employed, or attempted to be employed, within the United States for [these unlawful purposes,] ... the said vessel and its cargo shall be seized and forfeited."

Thus, not only did American *colonial* law authorize the forfeiture of sailing ships and other vessels involved in customs and revenue violations, but (after the adoption of the federal constitution in 1789) American federal law carried this legal tradition forward into the mid-twentieth century.

Moreover, the historical record shows that many of these pre-1970 federal statutes called for *in personam* forfeitures as part of a person's punishment for smuggling, revenue evasion, or poaching. In other words, these federal forfeiture statutes authorized both *in rem* and *in personam* forfeitures for the same customs and revenue law violations.

---

[52] *See* Revised Statutes of the United States, § 1955 (enacted July 27, 1868).

I acknowledge that the earliest of these forfeiture provisions were ambiguous as to whether the government was required to pursue the forfeiture in an *in rem* civil proceeding or whether the government was also authorized to seek the forfeiture as part of a person's criminal sentence for violating the customs laws. [53]

---

[53] *See*, for example, Statutes at Large, 1st Congress, first session, chapter 5 ("An Act to regulate the Collection of the Duties imposed by law on the tonnage of ships or vessels, and on goods, wares and merchandises imported into the United States") (July 31, 1789), section 12:

> *And be it further enacted*, That no goods, wares or merchandise, shall be unladen or delivered, from any ship or vessel, but in open day, or without a permit from the collector for that purpose; and if the master or commander of any ship or vessel shall suffer or permit the same, such master and commander, and every other person who shall be aiding or assisting in landing, removing, housing, or otherwise securing the same, shall forfeit and pay the sum of four hundred dollars for every offence; shall moreover be disabled from holding any office of trust or profit under the United States, for a term not exceeding seven years; and it shall be the duty of the collector of the district, to advertise the names of all such persons in the public gazette of the State in which he resides, within twenty days after each respective conviction. And all goods, wares and merchandise, so landed or discharged, shall become forfeited, and may be seized by any officer of the customs; and where the value thereof shall amount to four hundred dollars, the vessel, tackle, apparel and furniture, shall be subject to like forfeiture and seizure[.]

A similar statutory provision — describing both typical criminal penalties and forfeitures in the same paragraph — is found in Statutes at Large, 1st Congress, second session, chapter 35 ("An act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships or vessels") (August 4, 1790), section 60:

> *And be it further enacted*, That if any goods, wares or merchandise, entered for exportation, with intent to draw back the duties, or to obtain any allowance given by law on the exportation thereof, shall be landed in any port or place within the limits of the United States as aforesaid, all such goods, wares and merchandise, shall be

(continued...)

But by the second half of the 1800s, when Congress expanded the use of forfeitures as a mechanism to enforce federal revenue laws following the Civil War, many of these federal statutes drew no distinction between *in rem* forfeitures of property and *in personam* forfeitures of property as part of a defendant's criminal sentence. In these statutes, the penalty clauses simply listed forfeitures as one of the punishments for the offense, along with imprisonment and fines. See, for example, Statutes at Large, 40th Congress, second session, chapter 41 (March 31, 1868), section 5 [54] which declared that any person who ran a distillery and who "defraud[ed] or attempt[ed] to defraud the United States of the tax on the spirits distilled by him ... shall forfeit the distillery and distilling apparatus used by him, [as well as] all distilled spirits and all raw materials for the production of distilled spirits found in the distillery and on the distillery premises, and shall, on conviction, be fined not less than five hundred dollars nor more than five thousand dollars, and be imprisoned not less than six months, nor more than three years."

Likewise, Statutes at Large, 39th Congress, first session, chapter 184 (July 13, 1866), section 29 [55] declared that whenever a person shipped distilled alcohol or wine under a false name or label, the person "shall forfeit [the liquor or wine] and shall, on conviction, be subject to ... a fine of five hundred dollars." Similarly, Statutes at Large, 40th Congress, second session, chapter 186 (July 20, 1868), section 99 [56] declared that

[53] (...continued)
subject to seizure and forfeiture, together with the ship or vessel from which such goods shall be landed, and the vessels or boats used in landing the same; and all persons concerned therein, shall on indictment and conviction thereof, suffer imprisonment for a term not exceeding six months.

[54] Revised Statutes of the United States, § 3257.

[55] Revised Statutes of the United States, § 3449.

[56] Revised Statutes of the United States, § 3451.

a person who falsified or fraudulently executed any document required by the federal revenue laws "shall, on conviction, be imprisoned for a term not less than one year nor more than five years; and the property to which such false or fraudulent instrument relates shall be forfeited." And under Statutes at Large, 39th Congress, first session, chapter 184 (July 18, 1866), section 7, any manufacturer who failed to keep proper accounts and pay the prescribed excise tax on cotton, "in addition to the payment of the tax to be assessed thereon, shall forfeit to the United States all cotton and all products of cotton in his possession, and shall be liable to a penalty of not less than one thousand nor more than five thousand dollars, to be recovered with costs of suit, or to imprisonment not exceeding two years, in the discretion of the court".

And, as I have already explained, the federal government used *in personam* forfeitures to enforce smuggling and poaching laws in its post-Civil War statutes governing Alaska. Take, for instance, the 1868 and 1870 statutes prohibiting the unauthorized hunting of seals and other fur-bearing mammals in Alaska. *See* sections 173 and 178 of Part I of the Carter Code of 1900 (Thomas H. Carter, *The Laws of Alaska*). Both of these statutes declared that "every person guilty [of killing these fur-bearing mammals] shall, for each offense, be fined not less than two hundred nor more than one thousand dollars, or imprisoned not more than six months, or both; and all vessels, their tackle, apparel, furniture, and cargo, found engaged in violation of this section shall be forfeited[.]"

See also section 5 of the Alaska Game Commission Act of January 13, 1925, codified in 1949 Compiled Laws of Alaska, Title 39, chapter 6. One provision of this act, ACLA § 39-6-7, required the forfeiture of all "boats, aircraft, wagons or other vehicles" that were used in, or in aid of, any violation of the Act's provisions regulating animals, birds, and game fish within the Territory of Alaska, and the statute further declared that these forfeitures were to be imposed *either* "upon conviction of the offender

2734

or upon judgment of a [federal] court ... that the [boats, aircraft, or vehicles] were being used ... in violation of this Act".

In sum, the historical record shows that our federal government has repeatedly employed both *in rem* forfeitures and *in personam* forfeitures to enforce customs, revenue, and poaching laws — from the very founding of our national government to the present day.

*(c) The Supreme Court's conflicting treatment of traditional <u>in rem</u> customs and revenue forfeitures in <u>Austin v. United States</u> (1993) as opposed to <u>Bajakajian v. United States</u> (1998)*

In *Austin v. United States*, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), the Supreme Court held that a great many of the *in rem* forfeitures traditionally used to enforce customs and revenue laws were governed — and limited — by the excessive fines clause of the Eighth Amendment.

More specifically, the Court held in *Austin* that the excessive fines clause governed all *in rem* forfeitures that could be classified as "punishments" — and the Court defined the category of "punishments" as including any and all forfeitures (even the *in rem* forfeitures imposed in civil lawsuits) whose purpose was not *solely* "remedial". Thus, under *Austin*, the only *in rem* forfeitures that were *not* governed by the excessive fines clause were the forfeitures whose purpose was strictly limited to seizing contraband and reimbursing the government for lost revenue and the costs of enforcing the law. Any other forfeiture — any forfeiture which was intended, even in small part, to deter people from violating the customs or revenue laws, or to punish

2734

people for violating those laws — constituted a "punishment" and was therefore governed by the excessive fines clause.[57]

As a practical matter, it is difficult to imagine any *in rem* forfeiture that qualifies as solely "remedial" under the *Austin* definition — an *in rem* forfeiture that does not tend, in any manner, to deter people from violating the law or to punish them for doing so.

Even when an *in rem* forfeiture is limited to the items that are themselves contraband — *i.e.*, items that it is illegal to possess, or items that it is illegal to import, export, or sell without paying the applicable duty or tax — the fact remains that someone paid money to purchase, manufacture, and/or transport this contraband. Thus, the risk that the government might take the contraband without compensation obviously tends to deter people who might be tempted to violate the customs and revenue laws.

Indeed, four years after *Austin*, in the case of *Hudson v. United States*,[58] the Supreme Court declared that this "solely remedial" test was "unworkable". As *Hudson* explained,

> We have since recognized that *all* civil penalties have some deterrent effect. See *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 777, n. 14, 114 S.Ct. 1937, 1945, n. 14, 128 L.Ed.2d 767 (1994); *United States v. Ursery*, 518 U.S. 267, 284–285, n. 2, 116 S.Ct. 2135, 2145–2146, n. 2, 135 L.Ed.2d 549 (1996). If a sanction must be "solely" remedial (*i.e.*, entirely nondeterrent) to avoid [being categorized as "punishment" for purposes of] the Double Jeopardy Clause, then no civil penalties are beyond the scope of the Clause.

---

[57]   *Austin*, 509 U.S. at 610, 113 S.Ct. at 2806.

[58]   522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).

*Hudson*, 522 U.S. at 102, 118 S.Ct. at 494–95 (emphasis added).

The following year (1998), the Supreme Court returned to this topic in *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

In *Bajakajian*, the Supreme Court retracted *Austin*'s broad assertion about the extent to which the excessive fines clause governs *in rem* forfeitures. The *Bajakajian* court declared that the excessive fines clause does not apply to the *in rem* forfeitures traditionally employed to enforce customs and revenue laws. Rather, the excessive fines clause applies only to the non-traditional *in rem* forfeiture provisions enacted by Congress beginning in the 1970s — forfeitures which, according to the *Bajakajian* court, constituted a novel expansion of the doctrine of forfeiture that "blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture[s]". [59]

With respect to all the "traditional" *in rem* forfeitures that have existed in this country from colonial times up to the present (for example, the forfeitures of ships, aircraft, and other conveyances used for smuggling), the *Bajakajian* court acknowledged that these forfeitures "in one sense impos[ed] a penalty", but the Court nevertheless declared (quoting its own 1845 decision in *Taylor v. United States*) that these forfeitures "truly deserve to be called remedial". [60] And because these traditional *in rem* forfeitures

---

[59]   *Bajakajian*, 524 U.S. at 331 n. 6, 118 S.Ct. at 2035 n. 6.

[60]   *Bajakajian*, 524 U.S. at 331, 118 S.Ct. at 2035, quoting *Taylor v. United States*, 44 U.S. 197, 210–11; 11 L.Ed. 559 (1845). The entire quotation from *Taylor* is this:

In one sense, every law imposing a penalty or forfeiture may be deemed a penal law; in another sense, such laws are often deemed, and truly deserve to be called, remedial. The [trial] judge [in this case] was therefore strictly accurate, when he [instructed the jury] that "It must not be understood that every law which imposes a penalty is, therefore, legally speaking, a penal law ... . Laws enacted for the prevention of fraud, for the suppression of a public wrong, or to effect a public good,

(continued...)

are properly classified as remedial, the *Bajakajian* court held that they "occupy a place outside the domain of the Excessive Fines Clause."[61]

In other words, the *Austin* decision (issued in 1993) declared that these traditional *in rem* customs and revenue law forfeitures are governed by the excessive fines clause of the Eighth Amendment, but the *Bajakajian* decision (issued five years later, in 1998) says that they are not.

*(d) What does <u>Bajakajian</u> really mean?*

Somewhat surprisingly, the *Bajakajian* decision does not contain an express statement that the Court had decided to limit or partially overrule the *Austin* decision. Instead, the *Bajakajian* opinion merely contains a footnote (footnote 6) which appears to be intended to limit *Austin*'s holding.

In footnote 6 of *Bajakajian*, 524 U.S. at 331, 118 S.Ct. at 2035, the Court declared that "some recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture[s]" — and the Court then cited the forfeiture in *Austin* as an example of what it was talking about. According to this footnote, *Austin* involved a forfeiture action that was "labeled" an *in rem* proceeding, but

---

[60]  (...continued)
are not, in the strict sense, penal acts, although they may inflict a penalty for violating them."  And he added, "It is in this light I view the revenue laws, and I would construe them so as most effectually to accomplish the intention of the legislature in passing them."

[61]  *Id.*, 524 U.S. at 331, 118 S.Ct. at 2035.

in reality this forfeiture was "punitive" because the object to be forfeited was "real property used 'to facilitate' the commission of drug crimes". [62]

(The disparaging quotation marks around the words "to facilitate" are the Supreme Court's. The Court seemingly intended to express doubt as to whether Austin's real property — his auto body shop and mobile home — could truly be classified as "instrumentalities" of his drug crimes.)

With regard to this conflict between *Austin* and *Bajakajian*, my colleagues assert that I am reading too much into the *Bajakajian* decision. In their majority opinion, my colleagues contend that *Bajakajian*'s discussion of traditional *in rem* forfeitures is merely dictum — that the *Austin* analysis of these *in rem* forfeitures remains good law, and that (accordingly) the excessive fines clause governs and limits the traditional *in rem* forfeitures of property that is used to commit or facilitate violations of the customs and revenue laws.

In an accompanying footnote, my colleagues cite nearly a dozen cases, all of them decided after *Bajakajian*, where courts used an *Austin* analysis to decide whether a forfeiture was "punitive" for purposes of the excessive fines clause. The implication of this footnote is that courts from around the country are routinely ignoring what *Bajakajian* said about traditional *in rem* forfeitures (*i.e.*, that these forfeitures are *not* governed by the excessive fines clause), and that courts are continuing to apply the *Austin* test to these forfeitures, even after *Bajakajian*.

But the cases cited by my colleagues do not depart from *Bajakajian*. All those cases deal with *in rem* forfeitures imposed under post-1970 anti-drug and anti-crime laws — forfeitures that *Bajakajian* says are still governed by the Eighth Amendment and the *Austin* test.

---

[62] *Bajakajian*, 524 U.S. at 331 n. 6, 118 S.Ct. at 2035 n. 6.

Contrary to what my colleagues assert, the post-*Bajakajian* case law indicates that courts from around the country have been paying close attention to what *Bajakajian* said about traditional *in rem* forfeitures. These courts do not view *Bajakajian*'s discussion of traditional *in rem* forfeitures as mere dictum. Rather, many of these courts have explicitly interpreted *Bajakajian* as limiting or partially abrogating *Austin*.

For example, in *United States v. Ahmad*, 213 F.3d 805, 812–13 (4th Cir. 2000), the Fourth Circuit recognized that the Supreme Court's decision in *Bajakajian* had limited the scope of *Austin*:

> [R]ather than following *Austin*'s view that traditional civil in rem forfeitures "historically have been understood, at least in part, as punishment," 509 U.S. at 618, 113 S.Ct. 2801, the *Bajakajian* Court concluded that "[t]raditional *in rem* forfeitures were ... not considered punishment." 524 U.S. at 331, 118 S.Ct. 2028. Indeed, the Court expressly stated that "[b]ecause they were viewed as nonpunitive, such forfeitures traditionally were considered to occupy a place outside the domain of the Excessive Fines Clause." *Id.* The *Bajakajian* Court noted, however, that because "some recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture," not "all modern civil *in rem* forfeitures are nonpunitive." *Id.* at 331 n. 6, 118 S.Ct. 2028 ... . Nonetheless, the *Bajakajian* analysis and language significantly limit *Austin*'s apparent conclusion that traditional civil in rem forfeitures generally are punitive to some degree.

*Ahmad*, 213 F.3d at 812–13.

The *Ahmad* court then added that *Bajakajian*'s category of "traditional" *in rem* forfeitures encompassed the forfeiture of the instrumentalities employed to commit or facilitate an act of smuggling, as well as the smuggled contraband itself:

*Bajakajian* expressly concluded that "[i]nstrumentalities historically have been treated as a form of 'guilty property' that can be forfeited in civil *in rem* proceedings." *Id.* at 333, 118 S.Ct. 2028. Moreover, although the *Bajakajian* Court noted the strict historical limits on what may be considered an instrumentality (such forfeitures are confined "to the property actually used to commit an offense and no more," *id.* at 333 n. 8, 118 S.Ct. 2028), the Court did not repudiate the established treatment of instrumentalities as forfeitable. Thus, not only did the *Bajakajian* Court recognize the well-established rule that true civil *in rem* instrumentality forfeitures are exempt from the excessive fines analysis, but it also did nothing to change or limit this rule.

*Ahmad*, 213 F.3d at 814.

The District of Columbia Court of Appeals has reached the same conclusion about the legal significance of *Bajakajian*. In *One 1995 Toyota Pick-Up Truck v. District of Columbia*, 718 A.2d 558, 560 n. 6 (D.C. 1998), the court wrote:

> [N]ot all *in rem* forfeitures constitute "fines" under *Austin*. In fact, as the *Bajakajian* court pointed out, certain traditional *in rem* forfeitures fall "outside the domain of the Excessive Fines Clause" because the action is thought to proceed against "guilty property" rather than against an offending owner and is thus nonpunitive. [citation omitted] This fiction has been explained in the following manner: "The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing ... . [T]he proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding *in personam*." [*Bajakajian*, 524 U.S. at 331, 118 S.Ct. at 2035, quoting *The Palmyra*, 25 U.S. 1, 14–15; 6 L.Ed. 531 (1827).]

The D.C. court then quoted footnote 6 of *Bajakajian* — the footnote which says that the Supreme Court's decision in *Austin* was aimed at "recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture", and that *Austin*'s "solely remedial" test was only meant to apply to "modern statutory forfeiture[s]".

In accord with this reading of *Bajakajian*, the D.C. appellate court characterized *Austin* narrowly — construing *Austin* as holding only that the excessive fines clause governed "the *in rem* civil forfeiture of conveyances and real property *for violation of the federal drug laws*". *One 1995 Toyota Pick-Up Truck*, 718 A.2d at 562 (emphasis added).

See also *United States v. Cheeseman*, 600 F.3d 270, 282–83 (3rd Cir. 2010) (noting that "[the] holding [in *Austin*] was narrowed somewhat by the Supreme Court in *Bajakajian*, wherein the Court noted that traditional *in rem* forfeitures were not punitive and would therefore fall outside of the Eighth Amendment's protections."); *United States v. Davis*, 648 F.3d 84, 96–97 (2nd Cir. 2011), and *United States v. An Antique Platter of Gold*, 184 F.3d 131, 139–140 (2nd Cir. 1999) (both holding that *in rem* forfeitures for violation of a customs statute are "non-punitive" and therefore "outside the scope of the Excessive Fines Clause"); *State v. Goodenow*, 282 P.3d 8, 15–16 (Or. App. 2012) (citing *Bajakajian* for the proposition that "traditional civil *in rem* forfeitures are independent of, and wholly unaffected by any criminal proceeding *in personam* [, and thus these] traditional civil *in rem* forfeitures have not been considered punishment against an individual for an offense"); *United States v. 1866.75 Board Feet & 11 Doors & Casings of Dipteryx Panamensis*, 587 F.Supp.2d 740, 754 (E.D. Va. 2008)[63] (citing *Bajakajian* for the proposition "[t]raditional *in rem* forfeitures were ... not considered punishment

---

[63]    Affirmed *sub nomine United States v. Thompson*, 332 F.App'x 882 (4th Cir. 2009).

against the individual for an offense" and that "[b]ecause they were viewed as nonpunitive, such forfeitures traditionally were considered to occupy a place outside the domain of the Excessive Fines Clause"); *United States v. 2011 Jeep Grand Cherokee*, 2013 WL 12106221 at *10–11 (W.D. Texas 2013) ("In light of *Bajakaijian*, courts have almost unanimously found that the Eighth Amendment does not apply to forfeitures arising from customs violations."); *United States v. Real Property Known as 415 E. Mitchell Ave., Cincinnati, Ohio*, 149 F.3d 472, 477 n. 3 (6th Cir. 1998) (noting that *Bajakajian* "distinguished the nonpunitive nature of civil *in rem* forfeitures relating to customs statutes" from the modern anti-drug and anti-crime statutes that had "blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture"); *United States v. Any & All Radio Station Transmission Equipment*, 2004 WL 2848532 at *10 n. 8 (S.D. N.Y. 2004) (upholding the *in rem* forfeiture of all the radio equipment used in the operation of an unlicensed radio station because, under *Bajakajian*, "the forfeiture of [the equipment] at issue here ... is squarely in the traditional [scope of *in rem* forfeitures]"); *In re [the] Residence at 319 E. Fairgrounds Drive*, 71 P.3d 930, 934 (Ariz. App. 2003) (recognizing *Bajakajian* as holding that "*in rem* forfeitures were traditionally nonpunitive", that they were therefore "considered to occupy a place outside the domain of the Excessive Fines Clause", and that these traditional *in rem* forfeitures included forfeiture of the "instrumentalities of crime"); *Commonwealth v. 1997 Chevrolet & Contents Seized from Young*, 160 A.3d 153, 165–66 (Penn. 2017) (recognizing *Bajakajian* as standing for the proposition, based on "the history of forfeitures", that "*in rem* forfeitures were traditionally viewed as non-punitive", and that "they [are] not encompassed by the Excessive Fines Clause").

But even setting all this case law to one side, the Supreme Court's post-*Austin* decisions demonstrate that the Supreme Court began to back away from *Austin*

soon after the *Austin* decision was issued. I describe this history in the next section of my dissent.

### (e) The legal context of <u>Austin</u>, and the Supreme Court's later treatment of the <u>Austin</u> test

In *Austin*, the Supreme Court declared that the excessive fines clause applied to any penalty or deprivation of property that constitutes a "punishment" — which the Court defined as any penalty or deprivation whose purpose was not solely "remedial". Using this test, the Court concluded that many traditional *in rem* forfeitures constitute "punishments" because these forfeitures are not *solely* remedial — since part of their purpose is to deter people from violating the customs and revenue laws, or to punish the people who violate these laws, or both.

The definition of "punishment" that the Supreme Court used in *Austin* was taken directly from the Court's earlier decision in *United States v. Halper*[64] — a case that was decided four years before *Austin*, and which the Supreme Court overruled four years after *Austin*.

*Halper* involved an issue of double jeopardy. The defendant in *Halper* was the manager of a health care company who fraudulently submitted 65 inflated claims of medical services — claims that were paid by Medicare. After this fraud was discovered, Halper was convicted of a federal crime, and he was sentenced to prison and a $5000 fine.[65] Then the federal government initiated a civil lawsuit against Halper for violating the federal civil "false claims" act. Under this statute, Halper was subject to a civil penalty of $2000 for each of the 65 fraudulent claims he submitted — a total of

---

[64]   490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).

[65]   *Halper*, 490 U.S. at 437, 109 S.Ct. at 1895–96.

$130,000, even though Medicare had lost only a few hundred dollars when it paid Halper's fraudulent claims. [66]

The trial court ruled that a civil penalty of this magnitude was, in effect, a criminal punishment — and that the double jeopardy clause of the Fifth Amendment protected Halper from receiving a second punishment for his crime. [67] And the Supreme Court affirmed the trial court's ruling.

To resolve Halper's case, the Supreme Court adopted a new definition of "punishment" — the same definition of "punishment" that the Court later relied on in *Austin*.

*Halper* declared that, because civil proceedings "may advance punitive as well as remedial goals", a court cannot assess whether a civil sanction constitutes "punishment" unless the court conducts "a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." [68] More specifically, a court must ask "[whether] the [civil] sanction as applied in the individual case serves [any of] the goals of punishment." [69] The Court then laid down the test that was carried forward in *Austin*:

> [P]unishment serves the twin aims of retribution and deterrence. ... Furthermore, retribution and deterrence are not legitimate ... government objectives [except in a punitive context]. From these premises, it follows that a civil sanction [is punishment if it] cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also

---

[66] *Id.*, 490 U.S. at 438–39, 109 S.Ct. at 1896–97.

[67] *Id.*, 490 U.S. at 439–440, 109 S.Ct. at 1897.

[68] *Id.*, 490 U.S. at 447–48, 109 S.Ct. at 1901.

[69] *Id.*, 490 U.S. at 447–48, 109 S.Ct. at 1901–02.

serving either retributive or deterrent purposes[.] ... We therefore hold that under the Double Jeopardy Clause a defendant who has already been punished in a criminal prosecution may not be subjected to an additional civil sanction [if] the second sanction may not be fairly characterized as remedial, but only as a deterrent or [as] retribution.

*Halper*, 490 U.S. at 448–49, 109 S.Ct. at 1902 (emphasis added).

Although *Halper* involved a civil monetary penalty rather than a civil forfeiture, the *Halper* decision consistently used the broader phrase "civil sanction" to describe its analysis and its holding. Thus, the Supreme Court's later decision in *Austin* appears to be a straightforward application of *Halper*'s "solely remedial" test to the issue of whether *in rem* forfeitures of property constitute "punishment" for purposes of the excessive fines clause.

But in 1996 (three years after *Austin* was decided), the Supreme Court altered course. The case that convinced the Supreme Court to take another look at *Halper* and *Austin* was *United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996).

The defendant in *Ursery* used his house to illegally grow and store marijuana. The government instituted an *in rem* forfeiture proceeding against Ursery's house, and Ursery ultimately settled this *in rem* forfeiture action by paying the government a little over $13,000. Just before the forfeiture action was settled, the government indicted Ursery for illegally growing marijuana. Ursery was later convicted of this offense and sentenced to prison. [70]

---

[70] *Ursery*, 518 U.S. at 271, 116 S.Ct. at 2138–39.

Ursery argued that his criminal prosecution and his resulting prison sentence violated the Fifth Amendment's guarantee against double jeopardy. In particular, Ursery relied on *Halper* and *Austin* for the proposition that the *in rem* forfeiture of his house constituted a "punishment", because this forfeiture did not serve solely "remedial" purposes. Ursery argued that since he had already been punished once (by this forfeiture) for his marijuana growing, his later criminal prosecution violated the double jeopardy clause.

On the face of it, Ursery's argument appeared to be the legal equivalent of a slam-dunk. *Halper* held that a civil sanction constituted a "punishment" for purposes of the double jeopardy clause if the civil sanction served any purpose other than a strictly remedial one, and *Austin* clarified that this same definition of "punishment" applied to *in rem* forfeitures. But the Supreme Court rejected Ursery's argument.

With regard to the *Austin* decision, the *Ursery* court declared that the question of whether an *in rem* forfeiture constitutes "punishment" for purposes of the excessive fines clause is different from the question of whether the *in rem* forfeiture constitutes "punishment" for purposes of the double jeopardy clause — because, according to the Court, the fact that *in rem* forfeitures might be "punitive" for purposes of the excessive fines clause "does not mean ... that those forfeitures are so punitive as to constitute punishment for the purposes of double jeopardy."[71] In other words, the Supreme Court declared that even though an *in rem* forfeiture might be sufficiently punitive to fall within the scope of the excessive fines clause, it might not be sufficiently punitive as to fall within the scope of the double jeopardy clause.

This was a remarkable position. As I have explained, the *Austin* court relied exclusively on *Halper*'s "solely remedial" test when the Court evaluated whether

[71]    *Id.*, 518 U.S. at 287, 116 S.Ct. at 2147.

the *in rem* forfeiture of Austin's auto body shop and mobile home constituted a "punishment" for purposes of the excessive fines clause. But *Halper*'s "solely remedial" test was formulated for the express purpose of evaluating whether a civil sanction was punitive enough to constitute a "punishment" for *double jeopardy* purposes. And, according to *Ursery*, the standard for deciding whether a civil sanction is a "punishment" for purposes of the double jeopardy clause is *more stringent* than the standard for deciding whether a civil sanction constitutes "punishment" for purposes of the excessive fines clause. Specifically, the *Ursery* court declared that some forfeitures might be punitive enough to qualify as "excessive fines" under the Eighth Amendment, but yet not so punitive as to constitute "punishments" for double jeopardy purposes. [72]

Seemingly, then, if a court used the *Austin* analysis and concluded that an *in rem* forfeiture was "punishment" under the *Halper* test — because the forfeiture served non-remedial purposes, at least in part — it would necessarily follow that this *in rem* forfeiture constituted a "punishment" for purposes of *both* the double jeopardy clause *and* the less stringent excessive fines clause. Yet, in *Ursery*, the Supreme Court declared that this was not so.

But more importantly, the *Ursery* court suggested that, in *Austin*, the Court should not have relied on the *Halper* test *at all*.

Despite the *Halper* opinion's repeated references to the entire category of "civil sanctions", the *Ursery* court now declared that *Halper* was "limited to the context of civil [monetary] penalties". The *Ursery* court explained that the *Halper* decision was

---

[72]   *Id.*, 518 U.S. at 287, 116 S.Ct. at 2147.

confined to this "narrow focus" because of "the distinction that we have drawn historically between civil forfeiture and civil [monetary] penalties."[73]

In other words, the *Ursery* court implied that the *Austin* court should not have treated the *Halper* test as the controlling law on the question of whether an *in rem* forfeiture of property constitutes a "punishment" — because (according to *Ursery*) the *Halper* decision dealt solely with civil monetary penalties, and thus it established no rule with respect to *in rem* forfeitures.

"In sum," the *Ursery* court declared, "nothing in *Halper* ... or *Austin* purported to replace our traditional understanding that civil forfeiture does not constitute punishment for the purpose of the Double Jeopardy Clause":

> Congress long has authorized the Government to bring parallel criminal proceedings and civil forfeiture proceedings, and this Court consistently has found civil forfeitures not to constitute punishment under the Double Jeopardy Clause. It would have been quite remarkable for this Court both to have held unconstitutional a well-established practice, and to have overruled a long line of precedent, without having even suggested that it was doing so. [Neither *Halper* nor *Austin*] dealt with the subject of ... *in rem* civil forfeitures for purposes of the Double Jeopardy Clause.

*Ursery*, 518 U.S. at 287–88, 116 S.Ct. at 2147.

The *Ursery* court then spent the concluding eight paragraphs of its opinion demonstrating that the forfeiture of Ursery's home — a home which, the Court declared,

---

[73] *Id.*, 518 U.S. at 282–83, 116 S.Ct. at 2144.

was an "instrumentality" of Ursery's marijuana growing operation — did not constitute a "punishment".[74]

Based on the historical record of American law, the *Ursery* court concluded — contrary to *Austin* — that Congress *never* viewed traditional *in rem* forfeiture proceedings as criminal sanctions against individual offenders, but instead viewed them as civil proceedings against the forfeitable property itself.[75] Thus, for example, a court's jurisdiction to declare property forfeit hinged solely on the government's physical control of the property — even if the government could not identify the owner, or could not obtain personal jurisdiction over the owner.[76]

Next, the *Ursery* court declared that there was "little evidence, much less the 'clearest proof' [required by our case law]," that the forfeiture of Ursery's house and similar forfeitures under the statute "are so punitive in form and effect as to render them criminal despite Congress's intent to the contrary."[77] Indeed, the Court declared that the forfeiture statutes involved in Ursery's case were, "in most significant respects, indistinguishable from those reviewed, and held not to be punitive, in *Various Items*, *Emerald Cut Stones*, and *89 Firearms*."[78]

---

[74]   *Id.*, 518 U.S. at 288–292, 116 S.Ct. at 2147–49.

[75]   *See id.*, 518 U.S. at 288–292, 116 S.Ct. at 2147–49.

[76]   *Id.*, 518 U.S. at 288–89, 116 S.Ct. at 2147.

[77]   *Id.*, 518 U.S. at 290, 116 S.Ct. at 2148.

[78]   *Id.*, 518 U.S. at 290, 116 S.Ct. at 2148 (citing *Various Items of Personal Property v. United States*, 282 U.S. 577, 581; 51 S.Ct. 282, 283–284; 75 L.Ed. 558 (1931); *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 235–236; 93 S.Ct. 489, 492–493; 34 L.Ed.2d 438 (1972); and *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984)).

The Supreme Court's discussion of this point in *Ursery* stands in stark contrast to *Austin*'s assertions that "the First Congress viewed [*in rem*] forfeiture as punishment", that the Supreme Court's own prior decisions "have recognized that statutory *in rem* forfeiture imposes punishment", and that "statutory *in rem* forfeiture ... historically [has] been understood, at least in part, as punishment." [79]

The *Ursery* court then declared that the "most significant" aspect of the forfeitures at issue in Ursery's case (forfeitures of real property that had been used to facilitate federal drug offenses) was the fact that these forfeitures, "while perhaps having certain punitive aspects", *also* "serve important nonpunitive goals":

> Requiring the forfeiture of [real] property used to commit federal narcotics violations encourages property owners to take care in managing their property and ensures that they will not permit that property to be used for illegal purposes. See *Bennis v. Michigan*, 516 U.S. 442, 452; 116 S.Ct. 994, 1000; 134 L.Ed.2d 68 (1996) ("Forfeiture of property prevents illegal uses [of that property] by imposing an economic penalty, thereby rendering illegal behavior unprofitable")[.]

*Ursery*, 518 U.S. at 290, 116 S.Ct. at 2148.

In other words, the Supreme Court declared that the forfeiture of Ursery's house was not a "punishment" because, even though the forfeiture had "punitive aspects", it *also* served a *deterrent* purpose. This is the polar opposite of what the Court

---

[79] *Austin*, 509 U.S. at 613, 614, and 618, respectively; 113 S.Ct. at 2807, 2808, and 2810, respectively.

said in *Austin*, where the Court declared that an *in rem* forfeiture will constitute a "punishment" if it serves, even in part, the purpose of deterrence. [80]

But this 1996 decision in *Ursery* was not the Supreme Court's final word on the analysis set forth in *Halper* and *Austin*. The following year, in *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). the Supreme Court again addressed — and finally disavowed — the *Halper* test.

The defendant in *Hudson* was one of group of bankers who misapplied bank funds by engaging in a series of fraudulent loans whose real purpose was to benefit Hudson himself. The Comptroller of the Currency took civil action against the bankers, imposing civil monetary penalties on them and also barring them from engaging in banking without the express permission of the Comptroller and other relevant regulatory agencies. [81]

Two and a half years later, the bankers were indicted on charges of conspiracy, making false bank records, and misapplication of bank funds. These charges were based on the same conduct for which the Comptroller had penalized the bankers. Relying on *Halper*, the bankers argued that these criminal charges were barred by the double jeopardy clause, but the lower court ultimately ruled that the civil penalties imposed by the Comptroller were not so grossly disproportionate to the damages caused by the bankers' conduct as to constitute "punishment" for double jeopardy purposes. [82]

Instead of simply letting this ruling stand, the Supreme Court granted *certiorari* because of its "concerns about the wide variety of novel double jeopardy

---

[80] *Austin*, 509 U.S. at 610, 621–22 & n. 14; 113 S.Ct. at 2806, 2812 & n. 14.

[81] *Hudson*, 522 U.S. at 96–97, 118 S.Ct. at 491–92.

[82] *Id.*, 522 U.S. at 97–98, 118 S.Ct. at 492.

claims spawned in the wake of *Halper*."[83]  The Court then disavowed the test for "punishment" that it had adopted in *Halper*.

In *Hudson*, the Supreme Court characterized *Halper* as "the first time we applied the Double Jeopardy Clause to a sanction without first determining that [the sanction] was criminal in nature" under the traditional test applied by the Court in its prior cases.[84]  Rather than using this traditional test, *Halper* had used a different test to evaluate whether a sanction constituted "punishment" for purposes of the double

---

[83]  *Id.*, 522 U.S. at 98, 118 S.Ct. at 492–93.

[84]  The *Hudson* court described the traditional test as follows:

Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction.  A court must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.  Even in those cases where the legislature has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive, either in purpose or effect, as to transform what was clearly intended as a civil remedy into a criminal penalty.

In making this latter determination, the factors listed in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–169, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963), provide useful guideposts, including:  (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether [the sanction] comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment — retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.  It is important to note, however, that these factors must be considered in relation to the statute on its face, and "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.

*Hudson*, 522 U.S. at 99–100, 118 S.Ct. at 493 (citations and internal quotes omitted).

jeopardy clause: whether the sanction "could not fairly be said *solely* to serve the remedial purpose of compensating the Government for its loss".[85] (Emphasis by the Court)

The Court then explained why it concluded that "*Halper*'s deviation from longstanding double jeopardy principles was ill-considered".[86]

First, the *Halper* test bypassed the necessary threshold question of whether the sanction at issue was in fact a "criminal" sanction. Instead, *Halper* mistakenly declared that it made no difference whether a sanction was civil or criminal — that the only thing that mattered was whether the sanction "was so grossly disproportionate to the harm caused as to constitute 'punishment'."[87]

While the *Hudson* court acknowledged that disproportionality was one relevant factor under the traditional test for distinguishing civil sanctions from criminal sanctions, it was only one of seven relevant factors. Moreover, the *Halper* test violated the traditional rule that, if the legislature viewed the sanction as civil, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."[88]

Second, *Hudson* declared that subsequent cases had shown that *Halper*'s "solely remedial" test was "unworkable". As *Hudson* explained,

> We have since recognized that *all* civil penalties have some deterrent effect. [Citations omitted] If a sanction must be "solely" remedial (*i.e.*, entirely nondeterrent) to avoid

---

[85]  *Id.*, 522 U.S. at 101, 118 S.Ct. at 494.

[86]  *Ibid.*

[87]  *Ibid.*

[88]  *Id.*, 522 U.S. at 100, 118 S.Ct. at 493.

implicating the Double Jeopardy Clause, then no civil penalties are beyond the scope of the Clause.

*Hudson*, 522 U.S. at 102, 118 S.Ct. at 494–95 (emphasis added).

This second criticism of *Halper* applies with full force to *Austin* as well. *Austin* adopted *Halper*'s "solely remedial" / "no aspect of deterrence" test to evaluate whether an *in rem* forfeiture is "punishment" for purposes of the excessive fines clause. But as *Hudson* explains, and as *Ursery* confirms,[89] virtually all civil sanctions involve an element of deterrence. Thus, the *Austin* test (like the *Halper* test) is "unworkable" (to use the adjective employed by the Supreme Court in *Hudson*).

For these reasons, I disagree with my colleagues when they assert that *Austin* is unchallenged precedent. Rather, *Austin* has been repeatedly battered — first by *Ursery*, next by *Hudson*, and most recently by *Bajakajian*.

In fact, *Bajakajian*'s assertion that traditional *in rem* forfeitures have long been understood to "occupy a place outside the domain of the Excessive Fines Clause" conforms much better to Supreme Court precedent than does *Austin*'s "solely remedial" / "no aspect of deterrence" test. I therefore interpret *Bajakajian* as limiting or partially abrogating *Austin*.

---

[89]   *See Ursery*, 518 U.S. at 284–285 n. 2, 116 S.Ct. at 2145–2146 n. 2:

Whether a particular [civil] sanction "cannot fairly be said *solely* to serve a remedial purpose" is an inquiry radically different from [the one] we have traditionally employed in order to determine whether, as a categorical matter, a civil sanction is subject to the Double Jeopardy Clause. ... If [this rule] were applied literally, then virtually every sanction would be declared to be a punishment: It is hard to imagine a [civil] sanction that has no punitive aspect whatsoever. (Emphasis by the Court.)

*(f) Austin's analysis of whether traditional in rem forfeitures are governed by the excessive fines clause is flawed — because the Austin court posed the wrong question*

The reasoning of the *Austin* decision can be compressed into the following argument: (1) The excessive fines clause governs any monetary penalty (no matter how it is labeled) if the penalty constitutes a "punishment". (2) Under the *Halper* test, any civil sanction that has at least *some* deterrent or punitive aspect is a "punishment". (3) The *in rem* forfeitures employed to enforce customs and revenue laws have traditionally been viewed as having at least some deterrent or punitive aspect. Therefore, (4) many if not most traditional *in rem* forfeitures constitute a "punishment", and they are therefore governed by the excessive fines clause.

This reasoning is flawed. As the Supreme Court explained in *Hudson*, the novel *Halper* / *Austin* test for what constitutes a "punishment" — the "solely remedial" / "no aspect of deterrence" test — was not a part of traditional American law, nor was it part of Supreme Court jurisprudence until the *Halper* decision was issued in 1989.

To determine whether traditional *in rem* customs and revenue law forfeitures are governed by the excessive fines clause of the Eighth Amendment, it is a mistake to ask whether some or all of those traditional forfeitures would qualify as "punishment" under a legal test adopted in 1989. Rather, one must ask what the 1st Congress intended when it drafted the Eighth Amendment two centuries earlier, in 1789. Did the 1st Congress intend for these traditional *in rem* forfeitures to be governed by the Eighth Amendment?

Compare the Supreme Court's decision in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed.746 (1886), which involved a Fourth Amendment challenge to a statute that allowed customs agents to board a vessel, search it for contraband, and seize suspected contraband, all without a warrant. The Supreme Court concluded that

Congress could not have intended the Fourth Amendment to outlaw these traditional, longstanding methods of enforcing the customs and revenue laws:

> The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the [federal] government.

> The first statute passed by congress to regulate the collection of duties, the act of July 31, 1789, (1 [Stat.] 43) contains provisions [allowing customs agents to search a vessel and seize contraband goods without a warrant]. As this act was passed by the same congress which proposed for adoption the original amendments to the constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the [fourth] amendment.

*Boyd*, 116 U.S. at 623, 6 S.Ct. at 528.

The same reasoning and conclusion apply to the question presented here: the question of whether Congress intended the excessive fines clause of the Eighth Amendment to govern and limit the *in rem* forfeitures that have traditionally been employed to enforce customs and revenue laws.

As I explained earlier in this dissent, both the laws of colonial America and the eighteenth-century laws of England included customs and revenue statutes that called for the forfeiture of sailing ships and other vessels used to transport contraband or to

otherwise aid in the violation of customs and revenue statutes. [90] And almost immediately after the federal Constitution was adopted in 1789, Congress took action to make sure that the ships involved in federal customs and revenue offenses were made subject to these same types of forfeitures. [91] The 1st Congress passed legislation that (1) imposed fines on people who tried to evade the customs duties, (2) authorized the forfeiture of smuggled goods, and (3) authorized the forfeiture of sailing ships, smaller boats, and other conveyances that were used to transport smuggled goods or to off-load them from the ship. [92]

By far, the greatest penalty imposed by these customs statutes was the forfeiture of the sailing ships used to transport the smuggled goods. These ships were subject to forfeiture regardless of the ship's value — and merchant ships at the beginning of the nineteenth century were worth several tens of thousands of dollars.

In September 1789, a few weeks after Congress enacted these early forfeiture laws, Congress approved the Eighth Amendment and sent the proposed amendment to the states (together with the rest of the Bill of Rights). The Eighth

---

[90] *Pearson Yacht Leasing*, 416 U.S. at 683, 94 S.Ct. at 2091–92. Also see the lengthy discussion of New York's colonial forfeiture laws (laws that imposed forfeiture of the sailing ships and other vessels employed to violate that colony's customs and revenue laws) in *C. J. Hendry Company v. Moore*, 318 U.S. 133, 145–48; 63 S.Ct. 499, 505–09; 87 L.Ed. 663 (1943).

[91] *Pearson Yacht Leasing*, 416 U.S. at 683, 94 S.Ct. at 2092.

[92] *See* Statutes at Large, 1st Congress, first session, chapter 5 (July 31, 1789), sections 12, 34, & 40; Statutes at Large, 1st Congress, second session, chapter 35 (August 4, 1790), sections 14, 27, 60, & 70.

Amendment took effect a little over two years later, in December 1791, after it was ratified by a sufficient number of states. [93]

During the two and a half years that the Eighth Amendment was pending (late 1789, 1790, and 1791), Congress continued to enact customs and revenue statutes that called for the forfeiture of sailing ships involved in smuggling. [94] Congress obviously believed that these forfeitures did not violate the excessive fines clause of the Eighth Amendment — an amendment that Congress had just asked the states to ratify.

It is no doubt true, as the Supreme Court said in *Austin*, that at the time the Eighth Amendment was proposed and ratified, the *in rem* forfeiture of sailing ships (together with their "tackle, apparel, and furniture") was "understood at least in part as punishment". [95] Indeed, the Supreme Court said as much in its 1845 opinion in *Taylor v. United States*, 44 U.S. 197, 210–11; 11 L.Ed. 559.

But the question is not whether these traditional *in rem* forfeitures were understood as having deterrent and punitive aspects. Rather, the question is whether the drafters of the Eighth Amendment thought that this proposed amendment was going to govern and limit these traditional *in rem* forfeitures — the same forfeitures which had existed under English and American colonial law for generations before the Revolution, the same forfeitures which Congress enacted both before and after Congress proposed the Eighth Amendment to the states, and the same forfeitures which enforced the customs and revenue laws that generated practically all of the newborn government's income.

---

[93] *See* the Library of Congress research guide, "Bill of Rights: Primary Documents in American History" (https://guides.loc.gov/bill-of-rights).

[94] See, for example, Statutes at Large, 1st Congress, second session, chapter 35 (August 4, 1790), sections 14, 27, and 70.

[95] *Austin*, 509 U.S. at 621–22, 113 S.Ct. at 2812.

I conclude that the answer to this question is "no". The 1st Congress did *not* think that they were asking the states to limit the federal government's power to impose these traditional *in rem* forfeitures. Rather, to paraphrase what the Supreme Court said in *Boyd* about warrantless customs searches of merchant vessels, it is clear that the members of 1st Congress did not regard the traditional *in rem* forfeitures of ships used to transport goods in violation of the customs laws as "excessive", nor did Congress intend these traditional forfeitures to be embraced within the Eighth Amendment's prohibition on excessive fines.

Thus, the history of the Eighth Amendment supports what the Supreme Court said in *Bajakajian*: that these traditional *in rem* forfeitures "occupy a place outside the domain of the Excessive Fines Clause."

*(g) Even though <u>Bajakajian</u> holds that <u>in personam</u> forfeitures are governed by the excessive fines clause of the Eighth Amendment, the <u>in personam</u> forfeiture in Jouppi's case — the forfeiture of an airplane used to facilitate smuggling — is indistinguishable from the <u>in rem</u> forfeitures traditionally employed to enforce smuggling laws. Thus, the forfeiture of Jouppi's airplane is not "grossly disproportional" to the gravity of Jouppi's offense under <u>Bajakajian</u>.*

*Bajakajian* declares that the excessive fines clause does not apply to the *in rem* forfeitures traditionally imposed for smuggling and other violations of the customs and revenue laws. On the other hand, however, *Bajakajian* holds that the excessive fines clause *does* govern all *in personam* forfeitures (*i.e.*, all forfeitures imposed as part of a defendant's sentence for a criminal offense).

As I explain in the appendix to my dissent, even though the *Bajakajian* court cites legal authority and legal history in support of this holding, the Supreme Court misinterprets the legal authority it cites, and the Court mischaracterizes the legal history

it relies on. Nevertheless, this Court is bound by *Bajakajian*'s holding that the excessive fines clause governs and limits all *in personam* forfeitures.

The forfeiture of Jouppi's airplane was imposed *in personam*, as part of his sentence for smuggling alcoholic beverages, and thus (under *Bajakajian*) Jouppi can challenge this forfeiture by asserting that it is an excessive fine for purposes of the Eighth Amendment.

(As I explained earlier in my dissent, when a court imposes an *in personam* forfeiture, the court only has authority to order forfeiture of *the defendant's* interest in the property. But because Jouppi successfully asserted in the district court that the airplane was owned entirely by him (as opposed to being owned, in whole or in part, by Ken Air LLC, the business run by Jouppi and his wife), the *in personam* forfeiture in Jouppi's case encompassed the entirety of the airplane.)

As my colleagues explain in this Court's opinion, the district court committed various errors of law when the court assessed whether the forfeiture of Jouppi's airplane was grossly disproportional to Jouppi's offense — and, for this reason, this Court is remanding Jouppi's case to the district court so that the district court can re-assess this question. I agree with my colleagues that the district court committed several significant errors, but I conclude that there is no reason to order the district court to reconsider this matter.

*Bajakajian* says that the excessive fines clause does not apply to the forfeiture of an aircraft or watercraft used to commit or facilitate an act of smuggling if the government seeks this forfeiture in an *in rem* proceeding against the airplane or ship itself.

The statute at issue in Jouppi's case, AS 04.16.220, authorizes the government to pursue an *in rem* proceeding against any aircraft or watercraft used in smuggling, or to seek *in personam* forfeitures of individual defendants' interests in the

aircraft or watercraft if the State successfully prosecutes those defendants for bootlegging — or both. See AS 04.16.220(a)(3)(C) (authorizing the forfeiture) and AS 04.16.220(d) (authorizing the government to seek the forfeiture in an *in rem* proceeding against the property itself, or to seek *in personam* forfeitures of the various defendants' interests in the property, as part of their sentences for bootlegging — or both).

Regardless of which type of forfeiture proceeding the State pursued, the State would be required to prove — in the words of AS 04.16.220(a)(3)(C) — that the "aircraft [was] used to transport or facilitate the transportation of ... [smuggled] alcoholic beverages".

The difference is this: To seek an *in personam* forfeiture of Jouppi's interest in the airplane as part of Jouppi's criminal sentence for smuggling, the State first had to prove beyond a reasonable doubt that Jouppi was guilty of the smuggling. On the other hand, in an *in rem* proceeding against the airplane itself, the State would not have to prove that Jouppi was involved in the smuggling. In fact, even if the smuggler/pilot had escaped without ever being identified, the State could still have pursued an *in rem* forfeiture action against Jouppi's airplane, so long as the State proved that *someone* had used (or had tried to use) the airplane for smuggling alcoholic beverages.

(In an *in rem* proceeding, Jouppi would technically be entitled to assert ownership of the airplane and attempt to prove that he was entitled to remission of the forfeiture under the provisions of AS 04.16.220(e) — the section of the statute that allows innocent, non-negligent property owners to seek remission of the forfeiture. But because Jouppi has been criminally convicted of the smuggling, his criminal judgement would conclusively establish that he is *not* an innocent, non-negligent owner.) [96]

---

[96]  *See Lane v. Ballot*, 330 P.3d 338, 341 (Alaska 2014) ("A criminal conviction for a serious crime has a collateral estoppel effect in a subsequent civil action relying on the same

(continued...)

Thus, there is only one material distinction that can be drawn between the *in personam* forfeiture in Jouppi's case and the traditional *in rem* forfeiture of Jouppi's airplane that could be imposed if the State initiated a civil *in rem* proceeding against the airplane itself under AS 04.16.220(d)(2). Here, the State not only proved that Jouppi's plane was used to facilitate an act of smuggling — a fact that would be sufficient, by itself, to support an *in rem* forfeiture of the plane — but the State also proved that Jouppi was himself an accomplice to the act of smuggling (and proved this fact beyond a reasonable doubt).

This additional aspect of the government's proof (*i.e.*, that Jouppi was personally guilty of smuggling) does not affect or undermine the State's proof that Jouppi's airplane would be forfeitable in a traditional *in rem* forfeiture action against the airplane itself — and *that* forfeiture, according to *Bajakajian*, would not be limited by the excessive fines clause of the Eighth Amendment.

The question, then, is whether it makes sense for this Court to say that this same traditional forfeiture of an airplane used for smuggling might potentially become "excessive" for purposes of the Eighth Amendment simply because the State proved, not only that the airplane was used for smuggling, but also that the owner of the airplane was himself criminally responsible for this act of smuggling.

The fact that Jouppi is personally guilty of smuggling does not suggest that the forfeiture of his airplane has somehow become "excessive". Rather, it suggests just the opposite.

---

96 (...continued)
set of operative facts. Thus[,] a criminal conviction resulting from a jury trial [can] be introduced as conclusive proof (rather than merely persuasive evidence) of the facts necessarily determined.").

I therefore interpret *Bajakajian* to mean that when the forfeiture of a defendant's interest in a ship or an airplane is imposed as part of the defendant's sentence for smuggling, this forfeiture is not "grossly disproportional" to the gravity of the offense.

(*Bajakajian* deals with the excessive fines clause of the Eighth Amendment, not the excessive fines clause found in Article I, Section 12 of the Alaska constitution. It is conceivable that Alaska's excessive fines clause might provide greater protection against forfeitures than its federal counterpart.[97] However, Jouppi has failed to brief any separate claim under the Alaska constitution,[98] and I express no opinion on the potential merits of any such claim.)

---

[97] As I have already noted in this dissent, the Alaska Supreme Court has construed the Alaska due process clause (Article I, Section 7) to give greater protection against *in rem* forfeitures than its federal counterpart — by requiring a remission of the forfeiture if the owner proves that they were both (1) innocent of the offense and (2) non-negligent regarding the possibility that their property would be used for the unlawful purpose. See *State v. Rice*, 626 P.2d 104, 114 (Alaska 1981), where the supreme court held that an *in rem* forfeiture violates the Alaska guarantee of substantive due process if the owner of the property "has done all that reasonably could be expected to prevent [its] illegal use".

[98] As this Court explained in *State v. Zerkel*, 900 P.2d 744, 758 n. 8 (Alaska App. 1995), "When a defendant asserts that the Alaska Constitution affords greater protection than the corresponding provision of the Federal Constitution, it is the defendant's burden to demonstrate something in the text, context, or history of the Alaska Constitution that justifies this divergent interpretation. *See, e.g.*, *Abood v. League of Women Voters*, 743 P.2d 333, 340–43 (Alaska 1987); *State v. Wassillie*, 606 P.2d 1279, 1281–82 (Alaska 1980); *Annas v. State*, 726 P.2d 552, 556 n. 3 (Alaska App. 1986); *State v. Dankworth*, 672 P.2d 148, 151 (Alaska App. 1983)."

*Conclusion*

For all the reasons I have explained here, I conclude that the forfeiture of Jouppi's airplane is certainly proper under a *Bajakajian* analysis. I therefore dissent from this Court's decision to remand Jouppi's case to the district court for reconsideration of this forfeiture. Instead, I would direct the district court to order the forfeiture of Jouppi's airplane.

*Appendix*

The *Bajakajian* court's mistaken characterization of the history of *in personam* forfeitures in American law

In *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), the Supreme Court concluded that the excessive fines clause of the Eighth Amendment does not govern the types of *in rem* forfeitures that have traditionally been employed to enforce customs and revenue laws (*e.g.*, forfeitures to punish and deter smuggling). At the same time, however, the Supreme Court held that the excessive fines clause *does* govern *in personam* forfeitures — *i.e.*, the forfeitures imposed as part of a defendant's sentence in criminal prosecutions for these same types of unlawful acts.

The Supreme Court justified this conclusion (that *in personam* forfeitures were governed by the Eighth Amendment, even though the corresponding *in rem* forfeitures were not) by asserting that *in personam* forfeitures were not a traditional aspect of American law — that these forfeitures were, instead, a recent development of the last fifty years. The Court asserted that early American lawmakers affirmatively rejected the use of *in personam* forfeitures, and that *in personam* forfeitures did not exist under American law until the latter part of the twentieth century, when the federal government initiated its "war on drugs".

This Court is bound by the holdings of the United States Supreme Court on matters of federal constitutional law; we must follow and apply those holdings, whether they are right or wrong. But as I am about to explain, the *Bajakajian* court's characterization of American law and American legal history relating to *in personam* forfeitures is demonstrably mistaken.

*The Bajakajian court's mistaken assertion that the 1st United States Congress expressly rejected the use of in personam forfeitures as punishment for federal criminal offenses*

In footnote 7 of the *Bajakajian* opinion (524 U.S. at 332, 118 S.Ct. at 2035), the Supreme Court asserted that the 1st United States Congress expressly prohibited the use of *in personam* forfeitures as punishment for any federal crime. But the *Bajakajian* court cited only one legal authority to support this assertion: Section 24 of the federal Crimes Act of 1790.

This early federal statute barred the United States government from imposing two types of penalties — "corruption of blood" and "forfeiture of estate" — for a number of federal capital offenses.[99] Here is the statutory wording that the Supreme Court relied on:

> *Provided always, and be it enacted*, That no conviction or judgment for any of the offences [described in the preceding sections of this Act] shall work corruption of blood, or any forfeiture of estate.

Statutes at Large, 1st Congress, second session, chapter 9 (April 30, 1790), section 24.

This portion of the Crimes Act of 1790 mirrors (and expands) the guarantee found in Article III, Section 3 of the federal constitution — the provision which addresses the penalty that can be imposed for treason against the United States. Under

---

[99]   This was not because Congress considered these offenses to be of little consequence. The Crimes Act of 1790 applied to the crimes of treason, murder, murder or robbery on the high seas, piracy, mutiny, engaging in hostilities against the United States, and assisting in the prison break of anyone "found guilty of treason, murder, or any other capital crime". Under the 1790 Act, all of these offenses were punishable by death — but the Act nevertheless prohibited the federal government from imposing the penalties of "corruption of blood" and "forfeiture of estate" on the defendant.

this provision, "no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted".

The Crimes Act of 1790, which governed a number of federal capital offenses, likewise prohibited the government from inflicting corruption of blood or forfeiture of estate on the defendants convicted of these offenses (even though these defendants could be sentenced to death). Indeed, the Crimes Act afforded broader sentencing protection than Article III, Section 3 — because the Crimes Act did not even allow the government to impose a forfeiture of estate that was limited to the lifetime of the defendant.

But contrary to what footnote 7 of *Bajakajian* says, Congress's decision to prohibit the penalties of "corruption of blood" and "forfeiture of estate" was *not* equivalent to a prohibition on the use of *in personam* forfeitures as a penalty for customs and revenue violations (or as a penalty for any other crime).

The first of the penalties prohibited by the Crimes Act of 1790, "corruption of blood", referred to the doctrine that a defendant convicted of treason or a felony no longer had any legal existence for purposes of the inheritance laws. At common law, this "corruption of blood" was an automatic consequence of a conviction for treason or a felony. When a defendant suffered corruption of blood, no other person could inherit property from, or through, the defendant — thus effectively disinheriting all of the defendant's descendants and other heirs. [100]

_____

[100] See the explanation of "corruption of blood" given in Blackstone's *Commentaries on the Laws of England*, Book 4 ("Of Public Wrongs"), chapter 29, p. 381:

[One] immediate consequence of attainder [for treason or a felony] is the corruption of blood, both upwards and downwards; so that an attainted person can neither inherit lands or other hereditaments from his ancestors, nor retain those he is already in

(continued...)

The second penalty prohibited by the Crimes Act of 1790, "forfeiture of estate", referred to the common-law doctrine that a person attainted of treason or any felony automatically lost their right to own *any property at all* — with the result that *all* of the defendant's property escheated to the Crown or to the defendant's feudal overlord.

Even in England, the penalties of "corruption of blood" and "forfeiture of estate" were unpopular. Just a few years before the American Revolution, William Blackstone criticized corruption of blood and forfeiture of estate (except during the lifetime of the felon) as being unjustly harsh, since these penalties usually inflicted a crushing blow on the defendant's family and all of the defendant's descendants. *See* Blackstone's *Commentaries*, Book 4, chapter 29, pp. 381–82. Thus, the federal Crimes Act of 1790 reflected the changing attitude (on both sides of the Atlantic) regarding these penalties.

But the *Bajakajian* opinion is simply wrong when, in footnote 7, the Court characterized the Crimes Act of 1790 as having abolished the use of *in personam* forfeitures under federal law.

In the Crimes Act, Congress declared that "forfeiture of estate" could not be imposed as a penalty for the various federal felony offenses listed in the Act. But "forfeiture of estate" is quite different from an *in personam* forfeiture.

An *in personam* forfeiture is imposed as part of a defendant's sentence for a specific crime. This forfeiture must be expressly authorized by statute, and the forfeiture is limited (broadly speaking) to the fruits of the defendant's crime and the

---

[100] (...continued)
possession of, nor transmit them by descent to any heir; but the same shall escheat to the lord of the fee, subject to the king's superior right of forfeiture: and the person attainted shall also obstruct all descents [through him] to his posterity, wherever they are obliged to derive a title through him to a remoter ancestor.

instrumentalities that were used to commit or facilitate that crime (*e.g.*, a ship, an airplane, equipment or gear, etc.), to the extent that those instrumentalities were owned by the defendant.

In contrast, "forfeiture of estate" refers to the English common-law doctrine that any person convicted of treason or a felony automatically lost their right to own *any property at all*. A person convicted of treason or a felony lost all claim to their real property, their chattel property, their rights of entry or use, and every other thing of value belonging to them — regardless of whether that property had any connection to the person's crime. [101]

Moreover, "forfeiture of estate" did not involve any judicial forfeiture proceeding. That is, the government did not have to institute *in rem* proceedings against the defendant's property, nor did the government have to seek an *in personam* forfeiture of the defendant's property as part of the defendant's sentence for the act of treason or the felony. Rather, under the "forfeiture of estate" doctrine, any person attainted of treason or a felony automatically lost their right to own *any* property simply by virtue of their criminal conviction. [102] Every thing of value belonging to the defendant essentially became *ownerless* by operation of law, and it all escheated to the Crown or to the defendant's feudal overlord.

In short, the penalty of "forfeiture of estate" that is prohibited by the Crimes Act of 1790 is not equivalent to the *in personam* forfeitures of particular items of property that can be imposed as part of a defendant's sentence for a specific crime. These two penalties are distinct. Indeed, this distinction was accurately described by the Supreme Court in *Austin v. United States*, 509 U.S. at 611–13, 113 S.Ct. 2806–07.

---

[101] *Pearson Yacht Leasing*, 416 U.S. at 682, 94 S.Ct. at 2091.

[102] *Ibid.*

So, contrary to what the Supreme Court asserted in footnote 7 of *Bajaka-jian*, the Crimes Act of 1790 did not affect the legality of *in personam* forfeitures.

(I note that Article I, Section 15 of the Alaska Constitution similarly declares, "No [criminal] conviction shall work corruption of blood or forfeiture of estate." At the Alaska constitutional convention, there was absolutely no debate regarding this provision (see the convention proceedings of January 6, 1956) — even though, as I have explained in this dissent, *in personam* forfeitures had been a fixture of Alaska law for almost a century when the Alaska constitution was drafted. The framers of our state constitution obviously saw no contradiction between, on the one hand, the *in personam* forfeitures imposed under Alaska law for smuggling and poaching, and, on the other hand, the guarantee in Article I, Section 15 that no criminal conviction would work a corruption of blood or a forfeiture of estate.)

Moreover, as I describe in the next section of this Appendix, the United States Congress — beginning with the 1st Congress, and over the next 150 years — repeatedly enacted laws that authorized *in personam* forfeitures of property as part of a defendant's criminal sentence for acts of smuggling, revenue evasion, and poaching.

In contrast, only once during that time did Congress enact a statute that imposed forfeiture of estate as a penalty.

In the summer of 1862 (the second summer of the Civil War), the United States Congress passed the Confiscation Act of July 17, 1862 — "An Act to suppress Insurrection, to punish Treason and Rebellion, to seize and confiscate the Property of Rebels, and for other Purposes." [103] This statute targeted all individuals who held offices of trust in the Confederacy (all persons holding office in either the Confederate

---

[103] *See* Statutes at Large, 37th Congress, second session, chapter 195 (July 17, 1862) (published in Statutes at Large, Vol. 12, pp. 589–592).

government or the government of any state participating in the rebellion, and all persons serving as officers in the Confederate armed forces), as well as any property owner in a loyal state or territory who (following the passage of the Act) "[should] ... assist and give aid and comfort to [the] rebellion".

Under section 5 of this Confiscation Act, the President of the United States was directed to "cause the seizure of all the estate and property, money, stocks, credits, and effects" of these rebels, and to use the property, and/or all funds resulting from the sale of this property, to support the Union army. In effect, the Act empowered the federal government to confiscate everything these people owned.

Interestingly enough, even though the justification for these forfeitures of property was the property owner's participation in, or active support of, armed rebellion against the United States, section 7 of the Confiscation Act called for these property forfeitures to be accomplished through civil *in rem* forfeiture proceedings rather than through criminal proceedings. But Congress's choice of *in rem* forfeiture proceedings appears to have been dictated by expediency, rather than by any doctrinal niceties concerning the distinction between *in rem* forfeitures and *in personam* forfeitures.

Given the political and military situation in the summer of 1862, it was extremely unlikely that agents of the federal government could obtain personal jurisdiction over any of the Confederate military officers and government officials named in the Act. Thus, there was little possibility that the forfeitures of these people's property could be accomplished through criminal proceedings and attendant *in personam* forfeitures. If the federal government was going to confiscate these rebels' property, the forfeitures had to be accomplished through *in rem* proceedings — by "suing" the property, without the need to establish personal jurisdiction over the owner.

Nevertheless, despite this use of *in rem* proceedings to accomplish the forfeitures (as opposed to *in personam* forfeitures in criminal proceedings), the members

of Congress who drafted the Confiscation Act of 1862 understood quite well that they were, in fact, imposing "forfeiture of estate" as a criminal penalty for armed rebellion against the United States.

For this reason, on the same day that Congress passed this "Act to suppress Insurrection, to punish Treason and Rebellion, [and] to seize and confiscate the Property of Rebels", Congress also passed Joint Resolution No. 63 — a resolution that was intended to clarify two important aspects of Congress's intent.

First, Congress declared that the Confiscation Act was not to be construed as applying "to any act or acts done prior to the passage [of the Act]" — *i.e.*, not to be construed in a way that would make the Confiscation Act an *ex post facto* law. And second, Congress declared that the Act was not to be construed in a manner that would "work a forfeiture of the real estate of the offender beyond his natural life" — *i.e.*, not to be construed in a way that would violate Article III, Section 3 of the federal constitution, which prohibits forfeiture of estate as a penalty for treason except for a forfeiture of estate that is limited to the life of the offender. [104]

After the Civil War, in the case of *Wallach v. Van Riswick*, 92 U.S. 202, 23 L.Ed. 473, 1875 WL 17831 (1875), the United States Supreme Court was called upon to interpret the Confiscation Act of July 17, 1862.

Charles S. Wallach served as an officer in the Confederate Army, and he owned real property in the District of Columbia. His property was seized by the federal government under the provisions of the Confiscation Act, and it was sold to a man named Van Riswick. After Charles Wallach died, his heirs (his children) sued Van Riswick to recover possession of this real estate. They argued that the forfeiture of their

---

[104] *See* Statutes at Large, Vol. 12, p. 627.

father's property ended with his death, and that they (as his heirs) were entitled to ownership of the property as if there had never been a forfeiture.

First, the Supreme Court acknowledged that the Confiscation Act of 1862 called for the forfeiture of a disloyal citizen's *entire estate* — the whole of the offender's real property, chattel property, and all other assets:  "The [Act's] description of [the] property ... liable to seizure is as broad as possible.  It covers the estate of the owner — all his estate or ownership.  No authority is given to seize less than the whole." *Wallach*, 92 U.S. at 207, 1875 WL 17831 at *4.

Nevertheless, the Court held that, under the terms of Congress's Joint Resolution No. 63, all forfeitures of estate authorized by the Confiscation Act were governed by the same limitation found in Article III, Section 3 of the federal constitution. That is, these forfeitures were limited to the life of the person whose disloyalty to the United States triggered the forfeiture.

As the Supreme Court explained, Congress adopted Joint Resolution 63 because many people in the federal government doubted whether the United States Constitution allowed Congress to authorize any forfeiture of a rebel's estate that extended beyond the life of the offender — since the justification for the forfeiture was the property owner's active support of armed rebellion against the United States:

> It was doubted by some, even in high places, whether Congress had power to enact ... any forfeiture of the land of a rebel [that] should extend or operate beyond his life.  [This] doubt was founded on the provision of the Constitution, in [Article III, Section 3], that "no attainder of treason shall work corruption of blood or forfeiture except during the life of the person attainted."  It was not doubted that Congress might provide for forfeitures [of a rebel's estate] effective during the life of an offender.  [Rather, the] doubt related to

the possible duration of [the] forfeiture ... .  It was to meet
[this] doubt ... that [Joint Resolution No. 63] was adopted.

*Wallach*, 92 U.S. at 208–09, 1875 WL 17831 at *5.

As I have already explained, Congressional Resolution No. 63 declared that "no [forfeiture] proceedings under [this Confiscation Act shall] be so construed as to work a forfeiture of the real estate of the offender beyond his natural life."  The Supreme Court declared that the "obvious meaning" of this language was that the "condemnation and sale [of the offender's real property] shall not affect the ownership of the property after the termination of the offender's natural life."  Thus, after the offender's death, "the land shall pass or be owned as if it had not been forfeited"[105] — even if the federal government had sold the land to an innocent purchaser (as was the case with Wallach's land).[106]

In sum:  Even though the Confiscation Act of 1862 called for *in rem* forfeitures of the property owned by rebels, Congress acknowledged that these forfeitures were a punishment for the owners' active support of the armed rebellion against the federal government, and thus the forfeitures should be limited by Article III, Section 3's restriction on the permissible sentences for treason.

*The Bajakajian court's mistaken assertion that there were no in personam forfeitures in American law until the late twentieth century*

In footnote 7 of the *Bajakajian* decision, the Supreme Court asserted that, during the first 180 years of our country's existence, American law did not employ

---

[105] *Wallach*, 92 U.S. at 209, 1875 WL 17831 at *5.

[106] *Id.*, 92 U.S. at 209–210, 1875 WL 17831 at *5.

*in personam* forfeitures. The Court declared that *in personam* forfeitures did not exist in American law until 1970 — when (according to the Court) Congress began to enact criminal statutes that "resurrected" the English practice of imposing *in personam* forfeitures as part of a defendant's sentence for the offense. [107]

In other words, the Supreme Court asserted in *Bajakajian* that all of the forfeitures that were historically employed to enforce our customs and revenue laws (*e.g.*, the forfeitures of ships, airplanes, and other conveyances) were *in rem* forfeitures. According to the Court, these forfeitures never took the form of *in personam* forfeitures imposed as part of a defendant's criminal sentence for violating the customs or revenue laws. Rather, these forfeitures were always imposed in separate *in rem* civil lawsuits against the ship, airplane, or other conveyance itself.

But the Supreme Court's description of American legal history is mistaken. Many pre-1970 federal statutes imposed *in personam* forfeitures as part of a defendant's sentence in prosecutions for smuggling, tax evasion, and poaching. The historical record shows that Congress has repeatedly employed *both* types of forfeitures — *in rem* forfeitures and *in personam* forfeitures — throughout our nation's history.

I acknowledge that the earliest of these federal forfeiture provisions were ambiguous as to whether the government was required to pursue the forfeiture in an *in rem* civil proceeding or whether the government was also authorized to seek the forfeiture as part of a person's criminal sentence for violating the customs laws. [108]

---

[107] *Bajakajian*, 524 U.S. at 332 n. 7, 118 S.Ct. at 2035 n. 7.

[108] *See*, for example, Statutes at Large, 1st Congress, first session, chapter 5 ("An Act to regulate the Collection of the Duties imposed by law on the tonnage of ships or vessels, and on goods, wares and merchandises imported into the United States") (July 31, 1789), section 12:

(continued...)

But by the second half of the 1800s, when Congress expanded the use of forfeitures as a mechanism to enforce federal revenue laws following the Civil War, many of these federal statutes expressly authorized *in personam* forfeitures: these

---

[108] (...continued)

*And be it further enacted*, That no goods, wares or merchandise, shall be unladen or delivered, from any ship or vessel, but in open day, or without a permit from the collector for that purpose; and if the master or commander of any ship or vessel shall suffer or permit the same, such master and commander, and every other person who shall be aiding or assisting in landing, removing, housing, or otherwise securing the same, shall forfeit and pay the sum of four hundred dollars for every offence; shall moreover be disabled from holding any office of trust or profit under the United States, for a term not exceeding seven years; and it shall be the duty of the collector of the district, to advertise the names of all such persons in the public gazette of the State in which he resides, within twenty days after each respective conviction. And all goods, wares and merchandise, so landed or discharged, shall become forfeited, and may be seized by any officer of the customs; and where the value thereof shall amount to four hundred dollars, the vessel, tackle, apparel and furniture, shall be subject to like forfeiture and seizure[.]

A similar statutory provision — describing both typical criminal penalties and forfeitures in the same paragraph — is found in Statutes at Large, 1st Congress, second session, chapter 35 ("An act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships or vessels") (August 4, 1790), section 60:

*And be it further enacted*, That if any goods, wares or merchandise, entered for exportation, with intent to draw back the duties, or to obtain any allowance given by law on the exportation thereof, shall be landed in any port or place within the limits of the United States as aforesaid, all such goods, wares and merchandise, shall be subject to seizure and forfeiture, together with the ship or vessel from which such goods shall be landed, and the vessels or boats used in landing the same; and all persons concerned therein, shall on indictment and conviction thereof, suffer imprisonment for a term not exceeding six months.

statutes contained criminal penalty clauses that simply listed forfeitures along with the other authorized punishments of imprisonment and fines.

See, for example, Statutes at Large, 40th Congress, second session, chapter 41 (March 31, 1868), section 5 [109] which declared that any person who ran a distillery and who "defraud[ed] or attempt[ed] to defraud the United States of the tax on the spirits distilled by him ... shall forfeit the distillery and distilling apparatus used by him, [as well as] all distilled spirits and all raw materials for the production of distilled spirits found in the distillery and on the distillery premises, and shall, on conviction, be fined not less than five hundred dollars nor more than five thousand dollars, and be imprisoned not less than six months, nor more than three years."

Likewise, Statutes at Large, 39th Congress, first session, chapter 184 (July 13, 1866), section 29 [110] declared that whenever a person shipped distilled alcohol or wine under a false name or label, the person "shall forfeit [the liquor or wine] and shall, on conviction, be subject to ... a fine of five hundred dollars." Similarly, Statutes at Large, 40th Congress, second session, chapter 186 (July 20, 1868), section 99 [111] declared that a person who falsified or fraudulently executed any document required by the federal revenue laws "shall, on conviction, be imprisoned for a term not less than one year nor more than five years; and the property to which such false or fraudulent instrument relates shall be forfeited." And under Statutes at Large, 39th Congress, first session, chapter 184 (July 18, 1866), section 7, any manufacturer who failed to keep proper accounts and pay the prescribed excise tax on cotton, "in addition to the payment of the tax to be assessed thereon, shall forfeit to the United States all cotton and all

---

[109] Revised Statutes of the United States, § 3257.

[110] Revised Statutes of the United States, § 3449.

[111] Revised Statutes of the United States, § 3451.

products of cotton in his possession, and shall be liable to a penalty of not less than one thousand nor more than five thousand dollars, to be recovered with costs of suit, or to imprisonment not exceeding two years, in the discretion of the court".

The federal government also used *in personam* forfeitures to enforce smuggling and poaching laws in its post-Civil War statutes governing Alaska — for instance, the 1868 and 1870 statutes prohibiting the unauthorized hunting of seals and other fur-bearing mammals in Alaska. *See* sections 173 and 178 of Part I of the Carter Code of 1900 (Thomas H. Carter, *The Laws of Alaska*). Both of these statutes declared that "every person guilty [of killing these fur-bearing mammals] shall, for each offense, be fined not less than two hundred nor more than one thousand dollars, or imprisoned not more than six months, or both; and all vessels, their tackle, apparel, furniture, and cargo, found engaged in violation of this section shall be forfeited[.]"

See also section 5 of the federal Alaska Game Commission Act of January 13, 1925, codified in 1949 Compiled Laws of Alaska, Title 39, chapter 6. One provision of this act, ACLA § 39-6-7, required the forfeiture of all "boats, aircraft, wagons or other vehicles" that were used in, or in aid of, any violation of the Act's provisions regulating animals, birds, and game fish within the Territory of Alaska, and the statute further declared that these forfeitures were to be imposed either "upon conviction of the offender" or, alternatively, "upon judgment of a [federal] court ... that the [boats, aircraft, or vehicles] were being used ... in violation of this Act".

In sum, contrary to what the Supreme Court said in *Bajakajian*, the use of *in personam* forfeitures was just as much a fixture of pre-1970 American law as the use of *in rem* forfeitures.

*Conclusion*

This Court, like all other federal and state courts, is bound by the holdings of the United States Supreme Court on matters of federal constitutional law, even when portions of the Court's rationale for its holding are mistaken. Nevertheless, our legal system functions better if lower court judges and legal scholars point out the instances where the Supreme Court has relied on mistaken assertions about the law or about this country's legal history. As I have explained in this Appendix, *Bajakajian*'s characterization of American law and American legal history relating to *in personam* forfeitures is demonstrably mistaken.